## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| MARIA VERGARA, SANDEEP PAL, JENNIFER REILLY, JUSTIN BARTOLET, JAMES LATHROP, and JONATHAN GRINDELL, individually and on behalf of similarly situated individuals, | ) ) ) ) ) ) | |
| *Plaintiffs*, | ) ) | No. 15-cv-06942 |
| v. | ) ) | Hon. Thomas M. Durkin |
| UBER TECHNOLOGIES, INC., a Delaware corporation, | ) ) ) | |
| *Defendant*. | ) ) | |

## PLAINTIFFS' *UNOPPOSED* MOTION FOR
## PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT

Myles McGuire
Evan M. Meyers
Paul T. Geske
MCGUIRE LAW, P.C.
55 W. Wacker Dr., 9th Fl.
Chicago, IL 60601
Tel: (312) 893-7002
Fax: (312) 275-7895
mmcguire@mcgpc.com
emeyers@mcgpc.com
pgeske@mcgpc.com

Hassan A. Zavareei
Andrea R. Gold
Andrew J. Silver
TYCKO & ZAVAREEI LLP
1828 L Street NW, Ste. 1000
Washington, DC 20036
Tel: (202) 973-0900
Fax: (202) 973-0950
hzavareei@tzlegal.com
agold@tzlegal.com
asilver@tzlegal.com

*Counsel for Plaintiffs and the members of the putative Settlement Classes*

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................... ii

TABLE OF AUTHORITIES ............................................................................................ iv

I.     INTRODUCTION ...................................................................................................... 1

II.    BACKGROUND ......................................................................................................... 2

    A.    The Telephone Consumer Protection Act. .................................................. 2

    B.    Procedural History And Factual Background. ........................................... 5

        i.    Uber's allegedly unlawful text messaging practices. ........................... 5

        ii.    The Illinois Litigation. ........................................................................... 7

        iii.    The California Litigation. ..................................................................... 9

    C.    Discovery. ..................................................................................................... 11

    D.    Settlement Negotiations. ............................................................................ 11

III.   SETTLEMENT TERMS ......................................................................................... 12

    A.    The Proposed Settlement Classes. ........................................................... 12

    B.    Monetary Relief. ......................................................................................... 13

    C.    Prospective Relief. ...................................................................................... 13

    D.    Notice And Settlement Administration. ................................................... 14

    E.    Opt-Out And Objection Procedure. ......................................................... 15

    F.    Attorneys' Fees And Incentive Awards. .................................................. 15

    G.    Release of Liability. .................................................................................... 16

IV.    PRELIMINARY APPROVAL & CERTIFICATION .......................................... 16

    A.    The Proposed Settlement Warrants Preliminary Approval. ................ 16

    B.    The Proposed Settlement Classes Meet All Requirements For Certification For Purposes Of Settlement Under Federal Rule 23. ..................................................... 22

        i.    The Proposed Settlement Classes are Ascertainable based on Objective Criteria. 22

        ii.    The Proposed Settlement Classes meet all four prerequisites to certification under Federal Rule 23(a). .................................................................... 24

            1.    Numerosity ............................................................................... 24

            2.    Commonality ............................................................................ 25

            3.    Typicality .................................................................................. 27

            4.    Adequacy .................................................................................. 28

        iii.    The Proposed Settlement Classes Are Certifiable Under Federal Rule 23(b)(3). 29

            1.    Common questions predominate within each Settlement Class. .............. 29

2.     A class action is the most efficient way of adjudicating the putative Settlement Class Members' claims and is superior to a multitude of individual lawsuits. .................................................................................. 32

iv.     The proposed Notice Plan satisfies Due Process and the requirements of Federal Rule 23. .................................................................................................... 34

v.     Plaintiffs' Counsel Should Be Appointed Class Counsel. .................................... 35

V.     CONCLUSION .............................................................................................................. 36

## TABLE OF AUTHORITIES

### Cases

*Agne v. Papa John's Int'l, Inc.*,
   286 F.R.D. 559 (W.D. Wash. 2012) ................................................................. 26

*Am. Int'l Grp., Inc. v. ACE INA Holdings, Inc.*,
   No. 07 CV 2898, 2012 WL 651727 (N.D. Ill. Feb. 28, 2012)................................. 33

*Amchem Prod., Inc. v. Windsor*,
   521 U.S. 591 (1997)...................................................................... 28, 29, 32, 33

*Armstrong v. Board of Sch. Dirs. of City of Milwaukee*,
   616 F.2d 305 (7th Cir. 1980) .......................................................................... 16, 17

*Birchmeier v. Caribbean Cruise Line, Inc.*,
   302 F.R.D. 240 (N.D. Ill. 2014)............................................................................. 23

*Booth v. Appstack, Inc.*,
   No. C13-1533, 2015 WL 1466247 (W.D. Wash. March 30, 2015)........................... 26

*Boundas v. Abercrombie & Fitch Stores, Inc.*,
   280 F.R.D. 408 (N.D. Ill. 2012)............................................................................. 23

*CE Design v. Beaty Const., Inc.*,
   07 C 3340, 2009 WL 192481 (N.D. Ill. Jan. 26, 2009) .................................... 27, 29

*Eisen v. Carlisle & Jacquelin*,
   417 U.S. 156 (1974).............................................................................................. 34

*Erica P. John Fund, Inc. v. Halliburton Co.*,
   563 U.S. 804 (2011).............................................................................................. 29

*Gasper v. Linvatec Corp.*,
   167 F.R.D. 51 (N.D. Ill. 1996).............................................................................. 27

*Gen. Tel Co. of Sw. v. Falcon*,
   457 U.S. 147 (1982).............................................................................................. 33

*Golon v. Ohio Savs. Bank*,
   98 C 7430, 1999 WL 965593 (N.D. Ill. Oct. 15, 1999) ........................................ 30

*Gomez v. Ill. State Bd. of Educ.*,
   117 F.R.D. 394 (N.D. Ill. 1987)............................................................................ 28

*Green v. Serv. Master On Location Servs. Corp.*,
   No. 07 C 4705, 2009 WL 1810769 (N.D. Ill. June 22, 2009) ................................ 31

*Haynes v. Logan Furniture*,
   503 F.2d 1161 (7th Cir. 1974) ............................................................................. 32

*Hinman v. M & M Rental Ctr., Inc.*,
   545 F. Supp. 2d 802 (N.D. Ill. 2008) ............................................................. passim

*In re AT&T Mobility Wireless Data Services Sales Litig.*,
  270 F.R.D. 330 (N.D. Ill. 2010) ................................................................. 17, 34

*In re Bridgestone/Firestone, Inc.*,
  288 F.3d 1012 (7th Cir. 2002) ....................................................................... 32

*In re Sears, Roebuck & Co. Front-loading Washer Prod. Liab. Litig.*,
  No. 06 C 7023, 2016 WL 772785 (N.D. Ill. Feb. 29, 2016) ....................................... 33

*Ira Holtzman, C.P.A. v. Turza*,
  728 F.3d 682 (7th Cir. 2013) ................................................................... 24, 32

*Isby v. Bayh*,
  75 F.3d 1191 (7th Cir. 1996) ......................................................................... 17

*Keele v. Wexler*,
  149 F.3d 589 (7th Cir. 1998) ......................................................................... 24

*Kessler v. Am. Resorts Int'l*,
  05 C 5944, 2007 WL 4105204 (N.D. Ill. Nov. 14, 2007) ............................................. 17

*Knutson v. Schwan's Home Serv., Inc.*,
  No. 3:12-cv-0964, 2013 WL 4774763 (S.D. Cal. Sept. 5, 2013) ..................................... 32

*Kristensen v. Credit Payment Servs.*,
  12 F. Supp. 3d 1292 (D. Nev. 2014) ................................................................. 31

*Lemon v. Int'l Union of Operating Eng's.*,
  216 F.3d 577 (7th Cir. 2000) ......................................................................... 29

*McCabe v. Crawford & Co.*,
  210 F.R.D. 631 (N.D. Ill. 2002) ..................................................................... 23

McKenna v. WhisperText,
  No. 5:14-cv-00424-PSG, 2015 WL 5264750 (N.D. Cal. Sept. 9, 2015) ................................. 18

*Mims v. Arrow Fin. Servs., LLC*,
  132 S. Ct. 740, 742 (2012) ......................................................................... 2, 3

*Mirfasihi v. Fleet Mortg. Corp.*,
  356 F.3d 781 (7th Cir. 2004) ......................................................................... 34

*Mitchem v. Illinois Collection Serv., Inc.*,
  271 F.R.D. 617 (N.D. Ill. 2011) ..................................................................... 22

*Mullins v. Direct Digital, LLC*,
  795 F.3d 654 (7th Cir. 2015) ......................................................................... 23

*Murray v. GMAC Mortg. Corp.*,
  434 F.3d 948 (7th Cir. 2006) ......................................................................... 32

*Ott v. Mortg. Inv'rs Corp. of Ohio*, 65 F. Supp. 3d 1046 (D. Or. 2014) ............................. 31

*Phillips Petroleum Co. v. Shutts*,
  472 U.S. 797 (1985) ................................................................................. 33

*Radamanovich v. Combined Ins. Co. of Am.*,
216 F.R.D. 424 (N.D. Ill. 2003) ............................................................ 29

*Randolph v. Crown Asset Mgmt.*, *LLC*,
254 F.R.D. 513 (N.D. Ill. 2008) ............................................................ 24

*Retired Chicago Police Ass'n v. City of Chicago*,
7 F.3d 584 (7th Cir. 1993) .................................................................... 27

*Rosario v. Livaditis*,
963 F.2d 1013 (7th Cir. 1992) .............................................................. 27

*Satterfield v. Simon & Schuster, Inc.*,
569 F.3d 946 (9th Cir. 2009) .................................................................. 4

*Schulte v. Fifth Third Bank*,
805 F. Supp. 2d 560 (N.D. Ill. 2011) .................................................... 19

*Sengenberger v. Credit Control Services, Inc.*,
No. 09-cv-2796, 2010 WL 1791270 (N.D. Ill. May 5, 2010)................... 4

*Silbaugh v. Viking Magazine Servs.*,
278 F.R.D. 389 (N.D. Ohio 2012) .................................................... 30, 31

*Smith v. Nike Retail Servs., Inc.*,
234 F.R.D. 648 (N.D. Ill. 2006)............................................................. 24

*Sojka v. DirectBuy, Inc.*,
35 F. Supp. 3d 996 (N.D. Ill. 2014) ........................................................ 4

*Soppet v. Enhanced Recovery Co.*,
679 F.3d 637 (7th Cir. 2012) .............................................................. 5, 23

*Synfuel Techs., Inc. v. DHL Express (USA), Inc.*,
463 F.3d 646 (7th Cir. 2006) ................................................................. 18

*Thrasher-Lyon v. Illinois Farmers Ins. Co.*,
861 F. Supp. 2d 898 (N.D. Ill. 2012) ..................................................... 4

*Vasco v. Power Home Remodeling Group LLC*,
No. 15-4623, 2016 WL 5930876 (E.D. Pa. Oct. 12, 2016) .................... 30

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011)............................................................................... 24

### Statutes

28 U.S.C. § 1715................................................................................... 35

47 U.S.C. § 227............................................................................. 1, 4, 25

Pub. L. No. 102-243, 105 Stat. 2394 (1991)............................................. 3

### Other Authorities

S. Rep. No. 102-178 (1991) ...................................................................... 2

**Treatises**

Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure (2d ed. 1987) ............. 22

Conte & Newberg, 4 *Newberg on Class Actions* (4th Ed. 2002)...................................... 16, 17, 21

*Manual for Complex Litigation* (4th ed. 2004)........................................................................... 17

**Regulations**

*Declaratory Ruling & Order, In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991,*
30 FCC Rcd. 7961 (2015) .................................................................................................. 3, 5

*Matter of Groupme, Inc./skype Commc'ns S.A.R.l Petition for Expedited Declaratory Ruling Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991,*
29 F.C.C. Rcd. 3442 (2014) ................................................................................................... 5

*Report & Order, In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991,*
18 FCC Rcd. 14014 (2003) ..................................................................................................... 3

I.    **INTRODUCTION**

After more than two years of vigorous litigation in multiple courts across the country, and after months of contentious negotiations, including before an experienced mediator, the Parties[1] are pleased to report that they have reached a class action settlement that, if approved, will provide substantial relief to thousands of consumers. In this putative class action brought under the Telephone Consumer Protection Act (the "TCPA"), 47 U.S.C. § 227, the Parties have reached a proposed Settlement, under which Defendant will establish a $20 million common fund to be distributed to the Settlement Classes after payment of fees, costs, and expenses. Under the Settlement, Defendant has also agreed to significantly modify its business practices in order to eliminate the allegedly unlawful text messages at issue.

By this Motion, Plaintiffs seek, *inter alia*, certification of their proposed Settlement Classes for purposes of settlement under Federal Rules 23(e) and (b)(3), and preliminary approval of the Settlement Agreement, claims procedure, and the proposed form and method of class notice. While Plaintiffs maintain that even absent a settlement they would be able to secure class certification and prevail on the merits at trial, success is not assured, and the Defendant, Uber Technologies, Inc. ("Uber"), has vigorously defended this case at every stage. If approved, the Settlement would bring meaningful relief to consumers as well as certainty and closure to what has been, and likely would continue to be, highly contentious and costly litigation.

By any measure, this Settlement is an extraordinary result. Plaintiffs have secured a $20 million Settlement Fund in a case where class certification and success on the merits were far from guaranteed. The Settlement therefore provides very meaningful monetary relief. The Settlement also provides significant prospective relief, in that Uber has agreed to modify its text messaging

---

[1] Unless otherwise stated, capitalized terms have the same meaning as those terms are used in the Settlement Agreement, attached as Exhibit A.

practices to help confirm that the telephone numbers it collects are accurate and that it only sends messages to those who have consented to receive them, as the TCPA requires.

As explained in detail below, the Settlement is fair, reasonable, and adequate, and is consistent with other TCPA settlements that have been approved in this District and in other courts throughout the country. Certification of the Settlement Classes is in the best interest of the putative class members and satisfies the requirements for certification of a settlement class under Federal Rule 23. Accordingly, Plaintiffs respectfully request that the Court enter an order (i) granting preliminary approval to the Settlement; (ii) appointing Plaintiffs as Class Representatives; (iii) approving the proposed notice plan; (iv) appointing Hassan A. Zavareei, Andrea R. Gold, and Andrew Silver of Tycko & Zavareei LLP and Myles McGuire, Evan M. Meyers, and Paul Geske of McGuire Law, P.C., as Class Counsel; and (v) scheduling a final approval hearing.

## II.    BACKGROUND

### A.    The Telephone Consumer Protection Act.

Seeking to protect consumers against a growing flood of invasive and unwanted automated calls, Congress enacted the TCPA to "ban all autodialed calls . . . [to] cellular phones . . . unless the called party consents to receiving them, or unless the calls are made for emergency purposes[.]" S. Rep. No. 102-178, at 6 (1991); *see also Mims v. Arrow Fin. Servs., LLC*, 132 S. Ct. 740, 742 (2012). Based on an extensive legislative record, Congress found that consumers "consider automated or prerecorded telephone calls, regardless of the content or the initiator of the message, to be a nuisance and an invasion of privacy," and that "[b]anning such automated or prerecorded calls . . . except when the receiving party consents to receiving the call . . . is the only effective means of protecting telephone consumers from this nuisance and privacy invasion." Pub. L. No. 102-243, § 2(10), 2(12), 105 Stat. 2394 (1991); *Mims*, 132 S. Ct. at 745 ("Congress reported,

'[m]any consumers are outraged over the proliferation of intrusive, nuisance [telemarketing] calls[.]").

The problems that Congress sought to address with the TCPA have grown worse in recent years as cellphones have become ubiquitous and companies have increasingly used mobile marketing in an effort to directly reach consumers. Many companies use SMS[2] messaging as an inexpensive way to advertise products and communicate with consumers on a massive scale.[3] However, marketers often fail to adopt measures to ensure that the individuals who receive automated text messages have consented in advance. Despite the enactment of the TCPA, the establishment of a national do-not-call list, and other efforts to reduce intrusive robocalls and automated text messages, unwanted calls and messages remain a top consumer complaint.[4]

Unwanted text messages are often even more invasive than calls to a home phone, because many people keep their cellphones with them at nearly all times. In addition to the annoyance and aggravation that necessarily accompanies the receipt of unwanted text messages, they can cause the called parties to incur costs, as many consumers have cellphone service plans that require them to pay for incoming text messages, or otherwise incur a usage deduction out of a limited amount of monthly messages. And even when recipients ask not to receive such messages, callers often fail to honor such requests.

To address the problems associated with unauthorized automated calls and text messages,

---

[2] The term "Short Message Service" or "SMS" describes a messaging system that allows cellular telephone subscribers to use their cellular telephones to send and receive short text messages, usually limited to 160 characters. An "SMS message" is a text message call directed to a wireless device through the use of the telephone number assigned to the device. When an SMS message call is successfully made, the recipient's cell phone makes noise or vibrates, alerting him or her that a text message call is being received.

[3] *Report & Order, In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, 18 FCC Rcd. 14014 (2003).

[4] *Declaratory Ruling & Order, In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, 30 FCC Rcd. 7961 (2015) (hereinafter, the "2015 FCC Order") ("By the fourth quarter of 2012, robocall complaints had peaked at more than 200,000 per month").

Section 227(b)(1) of the TCPA prohibits companies from making automated calls to an individual's cellphone number without the recipient's prior express consent. 47 U.S.C. § 227(b)(1); *Thrasher-Lyon v. Illinois Farmers Ins. Co.*, 861 F. Supp. 2d 898, 904-905 (N.D. Ill. 2012). Text messages are treated as "calls" under the TCPA. *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 954 (9th Cir. 2009); *Sojka v. DirectBuy, Inc*., 35 F. Supp. 3d 996, 1000 (N.D. Ill. 2014) ("[a] text message is a 'call' within the meaning of the TCPA"). The TCPA sets statutory damages in the amount of $500 per violation, which can be trebled if the violation was willful. *See* § 227(b)(3)(B-C).

While the TCPA restricts automated calls and text messages to cellphones, it does not ban automated calling entirely. Rather, companies may send automated text messages to individuals' cellphones without violating the TCPA so long as they obtain the recipients' express consent in advance of sending the text message. § 227(b)(1)(A) (exempting calls made with "the prior express consent of the called party"). Consent is an affirmative defense; the FCC and courts have held "that if the[re is a] question as to whether express consent was provided, the burden will be on the [defendant] to show it obtained the necessary prior express consent." *Sengenberger v. Credit Control Services, Inc.*, No. 09-cv-2796, 2010 WL 1791270, at *4 (N.D. Ill. May 5, 2010) (internal citation omitted).

The consent that matters for purposes of the TCPA is consent from the party who actually received the calls—not the person whom the defendant intended to call. Numerous courts and the FCC have confirmed that the TCPA's use of the phrase "called party" refers to the subscriber or actual user of the telephone number called. *See, e.g.*, *Soppet v. Enhanced Recovery Co.*, 679 F.3d 637, 639-41 (7th Cir. 2012) ("We conclude that 'called party' in § 227(b)(1) means the person subscribing to the called number at the time the call is made."). Consequently, any text messages

that Uber inadvertently sent to individuals who had no connection or affiliation with Uber were made without consent as a matter of law. As to consent of a recipient purportedly provided by a third-party intermediary, the FCC has "emphasize[d] that the intermediary may only convey consent that has *actually been provided* by the consumer; the intermediary cannot provide consent *on behalf of* the consumer[.]" *See Matter of Groupme, Inc./skype Commc'ns S.A.R.l Petition for Expedited Declaratory Ruling Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 29 F.C.C. Rcd. 3442, 3447 (2014).

The FCC and numerous courts have also clarified that consumers may revoke any consent that was previously given. 2015 FCC Order, ¶ 55 ("we clarify that consumers may revoke consent through any reasonable means."). As such, any individuals who are sent an automated text message after communicating a reasonable request to not receive any additional such messages can assert a claim under the TCPA. In other words, even if an individual initially gives valid consent to receive automated text messages, once that consent is revoked, any subsequent messages are unlawful.

### B. Procedural History And Factual Background.

#### i. *Uber's allegedly unlawful text messaging practices.*

Uber is an international technology company and the developer of the Uber mobile app— a smartphone application that connects available drivers with passengers seeking transportation. First Amended Class Action Complaint ("FAC"), Dkt. 82, at ¶ 18. The Uber app functions as a taxi-style transportation service, allowing consumers throughout the nation to submit trip requests through the app to drivers who then use their own automobiles to transport consumers to their requested destinations. *Id.* ¶ 19.

One of the primary ways in which Uber communicates with drivers, riders, and prospective app users is through SMS text messages sent to individuals' cellphones. *Id.* ¶ 20. Uber uses SMS

messaging to recruit potential drivers, as well as to encourage consumers to download its app to become riders and users of its service. *Id.* ¶ 23. For instance, Uber created a "Refer-a-Friend" program, by which existing users can enter the cellphone numbers of individuals who may be interested in becoming an Uber driver. *Id.* ¶ 25. As part of the Refer-a-Friend program, Uber, acting together with its text messaging vendor, Twilio, Inc.,[5] sent pre-scripted messages to cellphone numbers provided by referring individuals. *Id.* If a referred individual ultimately becomes a rider or driver and satisfies certain conditions, the referring individual receives a payment from Uber. *Id.* However, as Plaintiffs allege in their Complaint, many Refer-a-Friend messages have been received by individuals who have no connection to Uber or the referring individual, and thus did not provide their prior express consent to receive such messages. *Id.* ¶¶ 26, 64-77. Plaintiffs further allege that, even as to those Refer-a-Friend text message recipients who may have had some connection to Uber, Uber failed to adopt sufficient measures to obtain valid prior express consent. *Id.* ¶¶ 25-26. Plaintiffs allege that Uber provides hefty referral fees ranging from $250-$500 to referring drivers if Refer-a-Friend text message recipients ultimately become drivers and satisfy certain conditions, incentivizing mass referrals without valid consent. *Id.*

As stated in the Complaint, Plaintiffs also claim that, during the relevant time period, Uber's messaging system lacked the ability to recognize and honor individuals' requests that Uber cease sending them text messages, even where Uber received multiple such requests. *Id.* ¶¶ 30, 54, 71, 83, 94. The Complaint includes an excerpt from a complaint with the Federal Trade Commission, which states that "Uber has been texting me for the past month. They texted me on

---

[5] Twilio, Inc. provides services as an SMS aggregator. An SMS aggregator uses computerized messaging technology to serve as an intermediary or bridge between a company's messaging platform and the cellular telephone networks, allowing companies to send automated messages to consumers' cellphones *en masse*.

Christmas eve at 1:44am and 4:10am. I returned texts saying STOP. I wrote them an email asking them to remove my number from their lists. And I'm still getting text messages." *Id.* ¶ 30. Plaintiffs Bartolet, Grindell, Reilly, and Pal all allege that they asked Uber to cease texting them, but received numerous subsequent unlawful text messages from Uber. *Id.* ¶¶ 54, 71, 83, 94, 111.

Plaintiffs have also alleged that Uber's account signup process lacks sufficient procedures to confirm the accuracy of the information Uber receives from prospective users. *Id.* ¶ 27. As a result, Plaintiffs allege that many of the telephone numbers in Uber's possession are inaccurate, causing Uber to send unsolicited text messages to individuals who never expressed any interest in the Uber app and never provided consent to receive messages from Uber. *Id.* ¶ 28.

Each of the named Plaintiffs received unsolicited messages like those described above and subsequently filed suit against Uber. *Id.* ¶¶ 32-100.

### ii. *The Illinois Litigation.*

Plaintiff Vergara filed suit against Uber in the Northern District of Illinois on August 7, 2015. Dkt. 1. In her original Class Action Complaint and in the First Amended Class Action Complaint, Plaintiff Vergara alleges that she received numerous unsolicited text messages from Uber despite never having expressed any interest in being an Uber driver or rider. FAC, ¶¶ 32-35.[6] For example, at the time she received the messages at issue, Plaintiff Vergara had never downloaded the Uber mobile app or even visited Uber's website. *Id.* ¶ 34. Plaintiff Vergara alleges that she nonetheless received multiple unsolicited, automated text messages from Uber over the course of several weeks during 2015 in which Uber was apparently attempting to complete the sign-up process for the Uber app. *Id.* ¶¶ 32-33.

---

[6] Unless stated otherwise, all citations in this subsection that contain ECF numbers are references to filings or docket entries in the *Vergara* action, *Vergara v. Uber Techs., Inc.*, No. 15-cv-06942 (N.D. Ill.).

Uber filed its answer to Plaintiff Vergara's original Complaint on October 5, 2015. Dkt. 7. On October 16, 2015, before exchanging discovery, Uber moved to stay all proceedings. Dkt. 11. Following briefing and oral argument, the Court denied Uber's motion to stay on December 2, 2015. Dkt. 17. Plaintiff Vergara then propounded interrogatories and document requests on January 4, 2016, and Uber provided written responses on February 16, 2016.

During the months thereafter, Plaintiff Vergara continued pursuing documents and other discovery from Uber. On May 19, 2016, Uber moved for judgment on the pleadings pursuant to Rule 12(c). Dkt. 24. Once Uber's motion for judgment was filed, the Court stayed all discovery pending the outcome of Uber's motion. Dkt. 54.

On June 22, 2016, while Uber's motion for judgment on the pleadings was still pending, a plaintiff in another putative TCPA class action against Uber filed a motion to transfer with the Judicial Panel on Multidistrict Litigation, seeking to have all TCPA litigation against Uber transferred to the Northern District of Illinois for consolidated or coordinated proceedings. *See* Motion to Transfer Related Actions to the Northern District of Illinois Pursuant to 28 U.S.C. § 1407 for Coordinated or Consolidated Pretrial Proceedings, *In re Uber Techs., Inc. Telephone Consumer Protection Act (TCPA) Litig.*, MDL No. 2733, ECF No. 1. Since Plaintiff Vergara's action was included in the motion to transfer, Plaintiff Vergara moved for a stay pending resolution of the motion to avoid the risk of duplicative proceedings and inconsistent rulings in the event the motion to transfer was granted. Dkt. 40. Following full briefing, Plaintiff Vergara's motion to stay was granted on August 4, 2016. Dkt. 47.

The JPML ultimately denied the § 1407 motion to transfer. The Court subsequently lifted the stay, and Uber filed another motion for judgment on the pleadings on October 21, 2016. Dkt. 52. Uber's second motion for judgment on the pleadings was fully briefed as of December 6, 2016,

but no oral argument was scheduled. Once the Parties agreed to mediate, however, the Parties stipulated to stay the case pending the outcome of the mediation. Dkt. 61.

### iii.    The California Litigation.

Plaintiffs Jonathan Grindell, Jennifer Reilly, and James Lathrop filed suit against Uber alleging violations of the TCPA on December 31, 2014 in the United States District Court for the Northern District of California. *See Lathrop, et al. v. Uber Technologies, Inc.* (Case No. 3:14-cv-05678-JST), Dkt. 1.[7] Plaintiffs Sandeep Pal and Justin Bartolet joined the lawsuit on January 30, 2015. *Lathrop* Dkt. 10.  The plaintiffs who brought the California Litigation are all individuals who received unwanted text messages from Uber related to becoming a driver for Uber.

Plaintiffs Grindell, Bartolet, Lathrop, and Reilly all considered using the Uber app as drivers and entered some information, including their phone numbers, into the Uber internet application. FAC, ¶¶ 36-39, 51-52, 78-79, 91-92. Although they each decided not to complete that process, Uber continued to repeatedly text them and requested them to complete their applications. *Id*. ¶¶ 40-44, 53-56, 80-84, 93-94.  Plaintiffs Reilly, Bartolet, and Grindell each asked Uber to stop texting them, thereby revoking any purported initial consent, and each continued to receive text messages from Uber. *Id*. ¶¶ 54, 71, 83, 94, 111. For instance, Plaintiff Justin Bartolet started, but never completed, an application to drive as an Uber partner. After Uber began texting him to complete his application, he directed Uber to stop texting him by texting: "Stop texting this number." Notwithstanding this message, Uber sent Plaintiff Bartolet another 58 text messages urging him to complete his application.  *Id*. ¶¶ 91-100.

Plaintiff Sandeep Pal received several text messages from Uber about becoming an Uber partner driver via its "Refer-a-Friend" program, even though he never applied to be an Uber partner

---

[7] All citations that contain docket entries in the California action are denoted as *Lathrop* Dkt. No.

driver and never gave Uber his cellular telephone number. FAC, ¶¶ 64-77. Plaintiff Pal sent text messages back to Uber, trying to get Uber to stop texting him. Uber did not stop; instead, it sent Pal another text message, informing him that "Uber does not accept messages at this time." *Id*. ¶ 71.

Early in the case, Uber moved to dismiss the claims of some of the Plaintiffs in the California Litigation on the ground that they provided prior express consent to receive the text messages at issue by including their cellular telephone number as part of an incomplete application. *Lathrop* Dkt. 25. The court rejected this argument. *Id*. at 13. Further, the court noted that "[s]everal appellate and district courts have held that consent under the TCPA can be revoked, and that text messages sent after consent is revoked violate the TCPA," that "consumers may revoke consent through any reasonable means, either orally or in writing," and that Plaintiffs Reilly, Grindell, and Bartolet's allegations that "they revoked their consent are sufficient to permit their claims to survive Uber's motion to dismiss." *Id*. at 16.

In November of 2015, Uber moved to stay the California Litigation entirely pending both the Supreme Court's decision in *Spokeo, Inc. v. Robins*, 136 S.Ct. 1540 (2016), and the D.C. Circuit's decision on the appeal related to the 2015 FCC Order. *Lathrop* Dkt. 71. The court held a hearing on the motion and it was ultimately denied. *Lathrop* Dkt. 112.

In April of 2016, while the parties were in the midst of fact discovery and before any expert discovery had been conducted, Uber filed a summary judgment motion. *Lathrop* Dkt. 146. The court refused to consider the motion because it was premature, granting the Plaintiffs' motion pursuant to Fed. R. Civ. P. 56(d). *Lathrop* Dkt. 201.

### C.  Discovery.

The parties conducted significant discovery in the California Litigation. The parties issued several sets of interrogatories, requests for production, and requests for admission. All but one of the Plaintiffs were deposed; all of the Plaintiffs answered discovery and produced documents. The parties litigated several discovery disputes via the court's letter briefing process, extending over many months. Plaintiffs filed five separate Joint Letter Briefs, *Lathrop* Dkt. Nos. 159, 160, 161, 204, 235, and were largely successful. Among other things, Uber was ordered to produce a sample of its text logs and additional information about its website screen flows. Plaintiffs conducted three separate Rule 30(b)(6) depositions of Uber, as well as deposed four additional Uber employee witnesses. Uber ultimately produced over 4,000 pages of documents related to its text messaging practices and responded to 16 interrogatories. Plaintiffs also obtained documents and a deposition from third-party Twilio, the primary mobile-messaging company used by Uber to send its text messages.

The Plaintiffs in the California Litigation served their expert reports on Uber on February 15, 2017. Plaintiffs' experts, Randall Snyder and Arthur Olsen, provided testimony on Uber's alleged ATDS and its text message logs, respectively. The parties reopened the topic of potential settlement prior to scheduled depositions of Plaintiffs' experts. On March 1, 2017, the parties filed a stipulation to modify the case schedule, postponing certain deadlines (including upcoming class certification briefing) until after mediation. *Lathrop* Dkt. 246. On March 7, 2017, the court entered an order approving the parties' stipulation. *Lathrop* Dkt. 247.

### D.  Settlement Negotiations.

As the Parties awaited a ruling on Uber's Motion for Judgment in the Illinois Litigation, and as proceedings in the California Litigation neared class certification and summary judgment,

the Parties began to explore settlement. During this narrow window of time, the Parties agreed to conduct a mediation to determine whether a settlement could be reached to avoid the uncertainties and risks of a ruling on the Motion for Judgment and on class certification or summary judgment in the California Litigation.

On May 23, 2017, the Parties' counsel attended a full-day mediation in California with the Hon. Layn R. Phillips (Ret.) of Phillips ADR, a former U.S. District Court Judge with expertise in complex litigation. After a full day of negotiations, the Parties reached a settlement in principle. Following the formal mediation session, the Parties' counsel successfully resolved most of the key elements of the settlement and executed a settlement term sheet on June 14, 2017. These negotiations finally culminated in the class action Settlement Agreement for which Plaintiffs now seek preliminary approval.

## III.  **SETTLEMENT TERMS**

### A.  **The Proposed Settlement Classes.**

The proposed Settlement would create three settlement classes defined as follows:

Class A:  All persons or entities within the U.S. who, during the Class Period, used or subscribed to a wireless or cellular service who were sent one or more non-emergency text messages, utilizing Twilio, Inc.'s system, in connection with Uber's Refer-a-Friend program.

Class B:  All persons or entities within the U.S. who, during the Class Period, started Uber's driver partner application process but did not become an "active" driver in Uber's system, who used or subscribed to a wireless or cellular service, and to whom Uber sent one or more non-emergency text messages after the user or subscriber requested Uber to discontinue sending text messages.

Class C:  All persons or entities in the U.S. who, during the Class Period, were not party to a contract with Uber and/or who did not provide his or her cellular phone number to Uber, and who used or subscribed to a cellular telephone number to which Uber sent one or more non-emergency text messages.

Settlement Agreement, ¶ 41. Expressly excluded from the Settlement Classes are all persons who opt out, the Court and staff to whom this case is assigned, and any member of the Court's or staff's

- 12 -

immediate family. *Id*. ¶ 42. These exclusions are standard in class action settlement agreements generally and do not materially change the makeup of the Settlement Classes.

### B. Monetary Relief.

As part of the Settlement, Uber has agreed to establish a $20,000,000.00 cash Settlement Fund. *Id.* ¶ 45. The entire amount of the Settlement Fund will be distributed *pro rata* to Settlement Class Members who submit approved claims, after deductions for the costs of notice and administration, attorneys' fees and costs, and incentive award payments to Plaintiffs. *Id.* ¶¶ 45-47. Each Settlement Class Member may submit only one claim, but there is no cap on the amount that each individual Settlement Class Member can receive, up to the amount of the Settlement Fund, less fees and expenses the Court orders. *Id.*

Because the Settlement Fund is to be distributed to Settlement Class Members *pro rata*, the total payment to each Settlement Class Member will ultimately depend on the number of approved claims. *Id.* As discussed below, based on an estimate of the number of claims expected in response to the notice program developed with the assistance of the proposed Settlement Administrator, Epiq Systems Class Action and Claims Solutions, Plaintiffs anticipate a significant payment per Settlement Class Member well within the range of previously approved TCPA settlements.

### C. Prospective Relief.

In response to this litigation, Uber has already implemented changes designed to more faithfully honor text message recipients' opt-out requests. In addition, as part of the Settlement, Uber has agreed to significant non-monetary prospective relief. Specifically, Uber has agreed that, for at least two years after the Settlement goes into effect, it will abide by certain practices designed to reduce or eliminate unauthorized and misdirected text messages. *Id.* ¶ 48.

First, Uber has agreed to completely discontinue its Refer-a-Friend program on cellular phones that Uber issues to requesting drivers. *Id.* Second, Uber has agreed to maintain the robust opt-out protocol that it instituted after the cases were filed. *Id.* At a minimum, this opt-out protocol entails utilizing a robust set of opt-out terms that Uber's system is capable of recognizing, which will facilitate Uber's system's ability to correctly identify and abide by consumers' attempts to revoke consent to receive future messages. *Id.* Third, Uber has agreed to adhere to several account creation and signup processes to help reduce the incidence of contacting incorrect phone numbers. *Id.* These processes include confirmatory steps that ask users to verify the phone number they input during account signup, and automatic deletion of any unverified numbers. *Id.* Together, these processes will reduce or eliminate text messages like those at issue in this lawsuit, and will thus benefit the Settlement Class Members and the public at large.

### D. Notice And Settlement Administration.

The Parties have agreed to retain Epiq Systems Class Action and Claims Solutions ("Epiq") as the Settlement Administrator. Epiq will be responsible for receiving Claim Forms submitted by Settlement Class Members, determining whether all submitted information is complete and accurate, and effectuating class notice. *Id.* ¶¶ 36, 47, 57-59. Notice will be provided through a combination of direct mail and email notice, supplemented with Internet and print publication. *Id.* ¶¶ 57-59.

Most Settlement Class Members' contact information is contained in a List of Potential Settlement Class Members, which Uber will provide to the Settlement Administrator. *Id.* ¶ 57. The Settlement Administrator will effectuate individual notice by e-mail where possible and by U.S. Mail where e-mail delivery is not possible, provided that Uber also has a mailing address in its records or an address can be located by the Settlement Administrator through a reverse look-up. *Id.* ¶ 58. In addition to direct notice, the Settlement Administrator will also arrange for notice to

be published with a widely-read nationwide publication. *Id.* ¶ 58. All forms of Notice are attached to the Agreement as Exhibits 4-6.[8]

The direct notice will point Settlement Class Members to the Settlement Website, which will contain electronic versions of the Claim Form that can be submitted online (or via regular mail), as well as the full Settlement Agreement, important court documents, and answers to frequently asked questions. *Id.* ¶ 58. The format and language of each form of notice have been carefully drafted in straightforward, easy-to-read language, which clearly informs Settlement Class Members of all the material aspects of the Settlement, such as the relief they are entitled to under the settlement, Settlement Class Members' right to challenge the Settlement or opt out, and the amount of attorneys' fees that may be sought. *Id.* ¶¶ 58, Exs. 4-6.

### E. Opt-Out And Objection Procedure.

Settlement Class Members will have an opportunity to exclude themselves from the Settlement or object to its approval. *Id.* ¶¶ 60-66. The procedures and deadlines for filing opt-out requests and objections will be referenced in all forms of the notice and on the Settlement Website. *Id.*; *see also* Exs. 4-6. With respect to objections, the notices inform Settlement Class Members that the Final Approval Hearing will be their opportunity to appear and have their objections heard. *Id.* The notices also inform Settlement Class Members that they will be bound by the release unless they timely exercise their right to exclusion. *Id.*

### F. Attorneys' Fees And Incentive Awards.

Subject to Court approval, attorneys' fees are to be paid out of the Settlement Fund. *Id.* ¶¶ 45, 78. Under the Settlement Agreement, Class Counsel have agreed to limit their request for attorneys' fees to no more than 33.3% of the Settlement Fund, or a maximum of $6,660,000.00.

---

[8] Unless otherwise indicated, all references to numbered exhibits (e.g., "Ex. 1") are references to the exhibits attached to the Settlement Agreement, filed contemporaneously herewith.

*Id.* ¶ 78. Uber has agreed to not oppose a request for up to that amount. *Id.* ¶ 79. Uber has also agreed to pay from the Settlement Fund, subject to Court approval, incentive awards to the named Plaintiffs of $10,000 each. *Id.* ¶ 81.

### G. Release of Liability.

In exchange for the monetary and prospective relief described above, each Settlement Class Member who does not exclude himself or herself will be deemed to have released and forever discharged Uber and the other "Releasees" (e.g. Uber's affiliates) from any claims related to or arising out of sending a text or SMS message relating to Uber without their consent. *Id.* ¶¶ 49-54.

## IV. **PRELIMINARY APPROVAL & CERTIFICATION**

### A. The Proposed Settlement Warrants Preliminary Approval.

The proposed Settlement provides substantial monetary and nonmonetary relief to the Settlement Class Members and represents a fair and reasonable resolution of this dispute. It therefore merits court approval, along with notice to the Settlement Class Members. Judicial approval of a proposed class action settlement requires a finding that the agreement is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2); *Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 652 (7th Cir. 2006). This review involves a well-established two-step process. Conte & Newberg, 4 *Newberg on Class Actions*, § 11.25, at 38-39 (4th Ed. 2002); *Armstrong v. Board of Sch. Dirs. of City of Milwaukee*, 616 F.2d 305, 314 (7th Cir. 1980), *overruled on other grounds by Felzen v. Andreas*, 134 F.3d 873 (7th Cir. 1998); *In re AT&T Mobility Wireless Data Servs. Litig.*, 270 F.R.D. 330, 346 (N.D. Ill. 2010).

The first step is a preliminary, pre-notification evaluation to determine whether the proposed settlement is "within the range of possible approval." *Newberg*, § 11.25, at 38-39; *Armstrong*, 616 F.2d at 314. The preliminary approval evaluation is not a final fairness hearing. Rather, it is an evaluation to determine whether there is reason to notify the class members of the

proposed settlement and to proceed with a fairness hearing. *Newberg*, § 11.25, at 38-39; *Armstrong*, 616 F.2d at 314. The preliminary approval stage is an "initial evaluation" of the fairness of the proposed settlement based on the written submissions and informal presentation from the settling parties. *Manual for Complex Litigation,* § 21.632 (4th ed. 2004). If the Court finds a settlement proposal "within the range of possible approval," the case proceeds to the second step in the review process—the final approval hearing. *Newberg*, § 11.25, at 38-39.

Because every settlement is a compromise, courts should not reject a settlement solely because it does not provide a complete victory. Parties to a settlement "benefit by immediately resolving the litigation and receiving some measure of vindication for [their] position[s] while foregoing the opportunity to achieve an unmitigated victory." *In re AT&T*, 270 F.R.D. at 347 (internal quotations and citations omitted). There is a strong judicial and public policy favoring the settlement of class action litigation, and such a settlement should be approved by the Court after inquiry into whether the settlement is "fair, reasonable, and adequate." *Isby v. Bayh*, 75 F.3d 1191, 1198 (7th Cir. 1996). "Although this standard and the factors used to measure it are ultimately questions for the fairness hearing that comes after a court finds that a proposed settlement is within approval range, a more summary version of the same inquiry takes place at the preliminary phase." *Kessler v. Am. Resorts Int'l*, 05 C 5944, 2007 WL 4105204, at *5 (N.D. Ill. Nov. 14, 2007) (citing *Armstrong*, 616 F.2d at 314).

In evaluating whether a class action settlement is fair, reasonable, and adequate, courts consider a number of factors, including: (1) the strength of the plaintiff's case compared to the amount of the settlement offer; (2) an assessment of the likely complexity of a trial; (3) the length and expense of the litigation; (4) the amount of opposition to settlement among affected parties; (5) the opinion of competent counsel; and (6) the stage of the proceedings and amount of discovery

- 17 -

completed at the time of settlement. *Id.* (citing *Isby,* 75 F.3d at 1199). Of these considerations, the first is most important. *Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 653 (7th Cir. 2006).

Application of these factors to this case demonstrates that the proposed Settlement is fair, reasonable, and adequate. The Settlement in this case is an extraordinary result for the Settlement Class Members and provides significant monetary and nonmonetary benefits to the Settlement Classes, as every Settlement Class Member with an approved claim will receive an equal payment from a Settlement Fund totaling $20 million, less approved fees and expenses. As such, depending on the total number of approved claims, Settlement Class Members can receive in excess of $500 from the Settlement Fund—the full amount of statutory damages available per violation of the TCPA.

Plaintiffs believe their TCPA claims against Uber are strong, but are also aware that Uber has denied Plaintiffs' allegations and has raised several legal defenses, any of which, if successful, would result in the Plaintiffs and the proposed Settlement Class Members receiving no payment whatsoever. For example, Uber asserted in the California Litigation that all Refer-a-Friend messages are the product of human intervention, that is, actions by Uber mobile app users, which would defeat the ATDS element of the Settlement Class A Members' claims. For the same reasons, Uber has argued that it is not the maker or initiator of the Refer-a-Friend messages, and therefore cannot be held liable for those messages under the TCPA. *See McKenna v. WhisperText*, No. 5:14-cv-00424-PSG, 2015 WL 5264750, at *4–5 (N.D. Cal. Sept. 9, 2015) ("[A]n application that required human intervention to send invitational messages was not the 'maker or initiator' of the calls for TCPA purposes." (citation omitted)). Uber also challenged certification of any Refer-a-Friend class.

- 18 -

Uber has also raised several defenses to the other Settlement Class Members' Claims. As to Settlement Class B—the prospective drivers—Uber has argued that the Settlement Class B Members gave express consent to receive text messages when they inputted their phone numbers as part of an incomplete driver application process. And although the Settlement Class B Members subsequently attempted to revoke their alleged prior consent, Uber has taken the position that these attempts at revocation were ineffective, because they were not done by a "reasonable means" because they did not follow Uber's opt-out protocol. Uber has also argued, as to Settlement Class B, that it did not use an ATDS to send the text messages in question, that an identifiable class could not be ascertained, and that individualized issues would bar certification. As to Settlement Class C, Uber has argued that the relevant messages were not sent using an ATDS, because they were targeted to specific individuals—albeit not the person who ultimately received the message. *See generally* Dkt. 52. Uber has maintained that there is no liability under the TCPA for such "misdirected" or "wrong number" messages. Uber further believes that no class action could be certified for Settlement Class C because of purported individualized issues.

Taking these realities into account, and recognizing the risks involved in any litigation, the settlement relief represents an excellent result for the Settlement Classes. The total amount of the Settlement Fund, and the significant payments to participating Settlement Class Members, are significant in light of the risks of ongoing litigation. If Uber were to succeed on its defenses to liability against Plaintiffs' individual claims, the Settlement Class Members would recover nothing. In addition to Uber's defenses on the merits, Plaintiffs would have been required to prevail on a contested class certification motion, for which success is by no means guaranteed. *See Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 582 (N.D. Ill. 2011).

The second and third factors also favor approval of the Settlement here, as any trial in this matter is likely to be complex and expensive. "Settlement allows the class to avoid the inherent risk, complexity, time, and cost associated with continued litigation." *Id*. at 586 (citation omitted). Further, the trial is unlikely to take place for some time, given that prior to mediation, the Parties were actively litigating several issues, including the motion for judgment on the pleadings in the Illinois Litigation, as well as summary judgment and class certification in the California Litigation. "If the Court approves the [Settlement], the present lawsuit will come to an end and [Settlement Class Members] will realize both immediate and future benefits as a result." *Id*. Plaintiffs and Settlement Class Members will receive meaningful payments now, instead of years from now— or perhaps never. *See id.* at 582. In short, in the absence of settlement, it is certain that the expense, duration, and complexity of the protracted litigation that would result would be substantial.

Even in the event that the litigation reached trial, evidence and witnesses from across the country would have to be assembled in multiple forums. Given the complexity of the issues and the amount in controversy, the losing Party would likely appeal both the decision on the merits (at summary judgment and/or trial), as well as the decision on class certification. As such, the immediate relief provided to the Settlement Classes under the Settlement Agreement weighs heavily in favor of its approval compared to the inherent risk and delay of continued litigation, trial, and appeal.

As to the fifth factor, Plaintiffs' counsel believe that the proposed Agreement is in the best interest of Settlement Class Members because, upon submission of a valid Claim Form and approval of their claim, Settlement Class Members are eligible for a meaningful, immediate payment instead of having to wait for the litigation and appeals to run their course. Further, due to the defenses Uber has raised, and likely would raise at class certification, along with the enormous

resources that Uber has available to defend and litigate these cases through appeal, it is possible that the Settlement Class Members may receive no benefit whatsoever in the absence of this Settlement.

As for the final factor, the settlement discussions have followed an extended period of contentious discovery. The instant Settlement was not finalized until proposed Class Counsel conducted extensive investigation into the claims and defenses of the Classes, engaged in significant discovery efforts, and negotiated the Settlement. Plaintiffs' counsel reviewed thousands of pages of documents produced by Uber (as well as answers to numerous interrogatories), conducted several depositions of Uber's corporate designee and other Uber employees, and took third-party discovery (including a third-party deposition). Much of this discovery was obtained only after extended meet and confer discussions and, in several cases, contested discovery-related proceedings.

Presently, there is no opposition to the Settlement and, given the strength of this Settlement, Plaintiffs expect little or no opposition to the Settlement by Settlement Class Members. With the aid of a well-respected, neutral mediator, the Hon. Layn R. Phillips (Ret.), the Parties reached the Settlement after a full day, arms-length mediation. There is an initial presumption that a proposed settlement is fair and reasonable when it was the result of arms-length negotiations. *Newberg*, *supra*, § 11.42. The lengthy duration of the litigation; the extensive and sometimes contentious investigation and discovery process; the multiple months of contested settlement negotiations; the excellent result for the Settlement Classes in spite of the significant procedural and substantive hurdles faced by Plaintiffs; and the participation of an experienced mediator throughout the negotiation process are all testament to the fairness of the proposed Settlement.

Finally, the Court need not rule on a blank slate as to the reasonableness of Plaintiffs' proposed Settlement. Similar class action settlements involving alleged violations of the TCPA have received final approval in this District and elsewhere. *See, e.g.*, *Desai et al v. ADT Security Services, Inc.*, No. 11-cv-1925 (N.D. Ill. 2013) (approving settlement creating a $15 million fund for unauthorized robocalls to 1.4 million class members, resulting in a settlement payment of approximately $50-100 per class member); *Rose et al v. Bank of America Corp.*, No. 11-cv-02390 (N.D. Cal. 2014) (approving settlement creating a $32 million fund for unauthorized robocalls to 7.6 million class members, resulting in a settlement payment of approximately $20- 40 per class member); *Malta et al. v. Fed Home Loan Mortgage*, No. 10-cv-01290 (S.D. Cal. 2013) (approving settlement creating a $17 million fund for unauthorized robocalls to 5.1 million class members, resulting in a settlement payment of approximately $50-100 per class member); *Rojas et al v. Career Education Corp.*, No. 10-cv-05260 (N.D. Ill. 2012) (approving settlement creating a $20 million settlement fund for the transmission of 99,000 text messages entitling each class member to a $200 settlement payment). Although the precise number of claimants is not yet known, the parties expect that the Settlement in this case will create settlement payments within the range of these previously approved TCPA settlements. Accordingly, the proposed Settlement, which provides significant prospective relief along with a $20 million non-reversionary Settlement Fund, is fair, reasonable, and adequate, and warrants Court approval.

### B. The Proposed Settlement Classes Meet All Requirements For Certification For Purposes Of Settlement Under Federal Rule 23.

#### i. *The Proposed Settlement Classes are Ascertainable based on Objective Criteria.*

Although not explicitly required under Rule 23(a), some courts require that a proposed class be ascertainable. A class is ascertainable if "its members can be ascertained by reference to objective criteria[.]" *Mitchem v. Illinois Collection Serv., Inc.*, 271 F.R.D. 617, 619 (N.D. Ill. 2011)

(internal citations omitted); 7A Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1760, at 121 (2d ed. 1987) (noting that the class must be defined in a way that is administratively feasible for a court to determine whether a particular individual is a member). However, to meet the ascertainability requirement the Court "need not ascertain 'absent class members' actual identities' . . . [r]ather, 'it is enough that the class be ascertain*able*,' with class members to be identified during a claims administration process[.]" *Birchmeier v. Caribbean Cruise Line, Inc.*, 302 F.R.D. 240, 245 (N.D. Ill. 2014) (citing *Boundas v. Abercrombie & Fitch Stores, Inc.*, 280 F.R.D. 408, 417 (N.D. Ill. 2012)) (emphasis in original).

Here, the proposed Settlement Class Members are readily ascertainable using Uber's databases. These databases will show which phone numbers were sent text messages, the nature of the messages, and when the messages were sent. The Settlement Administrator can then determine a putative Settlement Class Member's identity by cross-referencing their phone number with Uber's records and national cellular number registries. *See Soppet*, 679 F.3d at 642 (describing use of a "reverse-lookup"). Because membership in the proposed Classes is easily determined for the vast majority of Settlement Class Members based on objective criteria and records that have already been produced or are readily accessible, the proposed Settlement Classes are ascertainable. *See Birchmeier*, 302 F.R.D. at 248; *see also Boundas*, 280 F.R.D. at 418 (finding that a proposed class is ascertainable even if the actual "names and addresses" of the class members are not identified); *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 661 (7th Cir. 2015), *cert. denied*, No. 15-549, 2016 WL 763259 (U.S. Feb. 29, 2016) (noting that ascertainability focuses on the "adequacy of the class definition itself" and not on the "difficulty [in] identify[ing] particular members of the class"). The Settlement Administrator will also publish notice online and in a national publication to provide notice to any Settlement Class Members for whom contact

information is not readily available. *Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781, 786 (7th Cir. 2004) ("When individual notice is infeasible, notice by publication in a newspaper of national circulation . . . is an acceptable substitute.")

### ii. The Proposed Settlement Classes meet all four prerequisites to certification under Federal Rule 23(a).

#### 1. Numerosity

The numerosity requirement of Rule 23(a)(1) is met where "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "Although there is no bright-line test for numerosity, a class of forty is generally sufficient to satisfy Rule 23(a)." *Hinman v. M & M Rental Ctr., Inc.*, 545 F. Supp. 2d 802, 805-806 (N.D. Ill. 2008); *McCabe v. Crawford & Co.*, 210 F.R.D. 631, 643 (N.D. Ill. 2002) (stating that a class of forty or more is sufficiently numerous). A plaintiff generally need not demonstrate the exact number of class members, but must offer a good faith estimate as to the size of the class. *Smith v. Nike Retail Servs., Inc.*, 234 F.R.D. 648, 659 (N.D. Ill. 2006).

Here the proposed Settlement Classes include consumers scattered across the country and number in many thousands of individuals. Based on Uber's initial class list and estimates provided by the Settlement Administrator, it is likely that direct notice will be emailed and mailed to over one million individuals. The Settlement Classes are therefore undoubtedly numerous. *See Hinman*, 545 F. Supp. 2d at 806 (the court "may make common sense assumptions in determining numerosity"). In short, the estimated number of individuals in the Settlement Classes, coupled with the fact that Settlement Class Members are geographically disbursed throughout the country, renders joinder impracticable and supports a finding of numerosity. *See, e.g.*, *Randolph v. Crown Asset Mgmt., LLC*, 254 F.R.D. 513, 517 (N.D. Ill. 2008).

2.     <u>Commonality</u>

The second prerequisite of Rule 23(a) requires that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). The commonality requirement is met where the putative class members share a "common contention" that is "capable of classwide resolution— which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Commonality is often present where defendants have "engaged in standardized conduct toward members of the proposed class." *Keele v. Wexler*, 149 F.3d 589, 594 (7th Cir. 1998); *Hinman*, 545 F. Supp. 2d at 806. The Seventh Circuit has found that class certification in TCPA cases is "normal," because the main issues in such cases are "common to all class members." *Ira Holtzman, C.P.A. v. Turza*, 728 F.3d 682, 684 (7th Cir. 2013).

In this case, there is a very high degree of commonality within each Settlement Class. Plaintiffs and all other Settlement Class members assert the same claim—that Uber violated Section 227(b)(1)(A) of the TCPA by using an ATDS to send text messages to their cellphones without prior express consent. Accordingly, the elements of each of the Settlement Class member's claims are identical. Further, within each Settlement Class, all of the Settlement Class Member's claims arise out of the same, uniform set of facts. Accordingly, common questions of law and fact include, but are not limited to:

**Settlement Class A:**

- Whether the members of Settlement Class A used or subscribed to a cellphone number that was sent one or more Refer-a-Friend text messages;

- Whether Uber had valid express consent of the members of Settlement Class A prior to sending its Refer-a-Friend text messages;

- Whether text messages sent via Twilio as part of Uber's Refer-a-Friend program were sent using an "ATDS";

- Whether "Refer-a-Friend" text messages fall within the TCPA's definition of "telemarketing" or "advertising," such that Uber was required to obtain message recipients' "prior express written consent" under 47 C.F.R. § 64.1200(a)(2);

- Whether messages sent to Settlement Class A members were sent in willful violation of the TCPA, such that the Settlement Class A members are entitled to treble damages under § 227(b)(3)(B-C).

**Settlement Class B:**

- Whether the members of Settlement Class B used or subscribed to a cellphone number that was sent one or more text messages from Uber;

- Whether the members of Settlement Class B began the application to become an Uber driver, but did not become an "active" driver in Uber's system;

- Whether text messages sent to individuals who began, but did not complete, the Uber driver application process were sent using an "ATDS";

- Whether Uber obtained valid prior express consent as part of its driver application process;

- Whether Uber may lawfully require text message recipients to text the word "STOP" or "SMS off"—with no variations—in order to opt-out of receiving future messages, even though FCC orders implementing the TCPA allow consumers to revoke consent by "any reasonable means," (2015 FCC Order, ¶ 55);

- Whether text messages sent to Settlement Class B members who previously revoked consent were sent in willful violation of the TCPA, such that the Settlement Class B members are entitled to treble damages under § 227(b)(3)(B-C).

**Settlement Class C:**

- Whether the members of Settlement Class C used or subscribed to a cellphone number that was sent one or more text messages from Uber;

- Whether the members of Settlement Class C were party to a contract with Uber and/or did not provide their cellphone number to Uber;

- Whether the messages sent to members of Settlement Class C were sent without the recipients' prior express consent;

- Whether text messages sent to members of Settlement Class C were sent using an "ATDS."

Many courts in other TCPA cases have concluded that the issues discussed above are sufficient to satisfy the commonality standard. Here, because Plaintiffs' "allegation is not merely that all class members suffered a violation of the TCPA, but rather that all class members [within each class] were sent substantially similar unsolicited text messages by the same defendant[], using the same automatic dialing technology, commonality is satisfied." *Agne v. Papa John's Int'l, Inc.*, 286 F.R.D. 559, 567 (W.D. Wash. 2012); *Booth v. Appstack, Inc.*, No. C13-1533, 2015 WL 1466247, at *8 (W.D. Wash. March 30, 2015) ("class members' TCPA claims are predicated on a common course of conduct by [defendant]: the use of the same predictive dialer to robocall . . . various cell phone numbers. As such, these claims implicate questions of law and fact that can be resolved in one stroke"), *modified in part*, 2016 WL 3030256. Therefore, the sheer number and significance of the common questions that exist within each proposed Settlement Class are sufficient to meet the commonality requirement as to each Settlement Class.

### 3. Typicality

The typicality prong of subsection 23(a)(3) requires that the class representative's claims be typical of the class members' claims. Fed. R. Civ. P. 23(a)(3). The typicality requirement focuses on whether the class representative's claims "have the same essential characteristics as the claims of the class at large." *Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 596-97 (7th Cir. 1993). The claims of the named plaintiff must stem from the same course of conduct that gave rise to the claims of the class, and must rest on the same legal theory. *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992); *Hinman*, 545 F. Supp. 2d at 806. Typicality does not require claims to be "identical," and is generally "liberally construed." *Gasper v. Linvatec Corp.*, 167 F.R.D. 51, 57 (N.D. Ill. 1996). Courts have found that typicality is met where the defendant's action of sending unsolicited advertisements resulted in TCPA claims of the named plaintiff and members of the class. *See, e.g.*, *CE Design v. Beaty Const., Inc.*, 07 C 3340, 2009 WL 192481, *5

(N.D. Ill. Jan. 26, 2009) (finding typicality where defendant's practice of sending unsolicited advertisements to the named plaintiff and the proposed class resulted in the claims of the potential plaintiffs being "based upon the same legal theory, *i.e.* violation of the TCPA.").

Plaintiffs and the members of the proposed Settlement Classes all allege that Uber sent them text messages without their prior express consent in violation of the TCPA. Within each proposed Settlement Class, the Settlement Class Members' claims arise out of a common course of conduct. Further, Plaintiffs and the putative Settlement Class Members have all suffered the same injury: a violation of their rights protected under the TCPA. As a result, Plaintiffs and the proposed Settlement Classes are entitled to identical statutory damages under the TCPA. Because the Settlement Class Members within each Settlement Class assert identical claims that are based on the same legal theory, the same facts, and the same course of conduct by the Uber, and seek redress for the same injury, each Plaintiff is typical of the respective Settlement Class they seek to represent.

### 4.    Adequacy

The final subsection of Rule 23(a) requires that the class representative "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This inquiry "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 625 (1997). To satisfy the adequacy requirement, class representatives must show that: (1) their claims are not antagonistic or in conflict with those of the proposed class, (2) they have sufficient interest in the outcome of the case, and (3) experienced, competent counsel represent them. *Hinman*, 545 F. Supp. 2d at 807. It is persuasive evidence of the adequacy of proposed class counsel where they have been found adequate to serve as class counsel in other cases. *Gomez v. Ill. State Bd. of Educ.*, 117 F.R.D. 394, 401 (N.D. Ill. 1987).

Here, Plaintiffs' interests are representative of and consistent with the interests of the proposed Settlement Class Members—all have received allegedly unlawful text messages and seek relief under the TCPA. Plaintiffs' pursuit of this matter over the course of years of protracted litigation demonstrates that they have been and will remain zealous advocates for the Settlement Classes. Plaintiffs have no interests that are antagonistic to the interests of the putative Settlement Class Members; rather, their primary interest is the same, namely, to obtain relief pursuant to the TCPA.

Plaintiffs are also represented by experienced, competent counsel. Proposed Class Counsel have regularly engaged in complex class litigation, and have extensive experience in consumer class action lawsuits involving cellular telephony and, in particular, the TCPA. Plaintiffs' counsel and their firms have been appointed as class counsel in numerous complex consumer class actions, including similar TCPA cases. *See* Declarations of Hassan A. Zavareei and Myles McGuire, attached hereto as Exhibits 2-3, respectively.

### iii. *The Proposed Settlement Classes Are Certifiable Under Federal Rule 23(b)(3).*

A class is certifiable under Rule 23(b)(3) where "questions of law or fact common to class members predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

#### 1. Common questions predominate within each Settlement Class.

The predominance inquiry focuses on whether a proposed class is sufficiently cohesive to warrant adjudication by representation. *Amchem*, 521 U.S. at 623. To satisfy the predominance requirement of Rule 23(b)(3), "each class member must share common questions of law or fact with the rest of the class, therefore making class-wide adjudication of the common questions

efficient compared to the repetitive individual litigation of the same question." *Lemon v. Int'l Union of Operating Eng's.*, 216 F.3d 577, 581 (7th Cir. 2000). While the common issues must predominate, they need not be exclusive. *Radamanovich v. Combined Ins. Co. of Am.*, 216 F.R.D. 424, 435 (N.D. Ill. 2003).

"Considering whether questions of law or fact common to class members predominate begins, of course, with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011) (internal quotation marks omitted). In TCPA cases, the predominance requirement is generally met where the class members' claims focus on a single calling operation or a single type of text message traffic. *See CE Design*, 2009 WL 192481, at *8-9. This is because, where a single telemarketing campaign or type of text message traffic is at issue, the facts underlying the elements of the class members' TCPA claims will be virtually identical. *See Silbaugh v. Viking Magazine Servs.*, 278 F.R.D. 389, 393-94 (N.D. Ohio 2012) (finding that common questions predominated where the "defendant set up a single text message marketing campaign . . . which was conducted in the same manner with respect to all of the class members"); *Vasco v. Power Home Remodeling Group LLC*, No. 15-4623, 2016 WL 5930876, at *4 (E.D. Pa. Oct. 12, 2016) (certifying TCPA class for purposes of settlement where the defendant "engaged in a common course of conduct by making unsolicited telemarketing calls to the Class Members.").

In this case, common questions predominate within each of the three proposed Settlement Classes, because each Class involves the same type of allegedly unlawful text message traffic. For instance, all members of Settlement Class A received Refer-a-Friend messages sent via Twilio's messaging system. All members of Settlement Class B received messages after beginning, and then aborting, the driver application process, and after asking Uber to stop texting them. All

members of Settlement Class C received unsolicited messages that were unlawful as a result of Uber's failure to implement mechanisms to obtain valid consent from those who were not users of its apps (i.e., drivers or riders). In other words, all of the members within each Settlement Class were sent text messages using the same messaging system and transmitted under similar circumstances without their prior express consent. As such, the elements of any given Settlement Class Member's claim will be based on the same classwide proof applicable to other Settlement Class Members within the same class. *Golon v. Ohio Savs. Bank*, 98 C 7430, 1999 WL 965593, at *4 (N.D. Ill. Oct. 15, 1999) (Predominance is satisfied "when there exists generalized evidence that proves or disproves an element on a simultaneous, classwide basis … [since s]uch proof obviates the need to examine each class member's individual position.").

Moreover, all of the Settlement Class Members in each of the Settlement Classes were sent messages without valid consent. Because consent is absent as to all of the Settlement Class Members, the principal affirmative defense to liability under the TCPA—prior express consent— is also a common issue. "[I]n the absence of any evidence of consent by the defendant, consent is a common issue with a common answer." *Kristensen v. Credit Payment Servs.*, 12 F. Supp. 3d 1292, 1307 (D. Nev. 2014); *Green v. Serv. Master On Location Servs. Corp.*, No. 07 C 4705, 2009 WL 1810769, at *2 (N.D. Ill. June 22, 2009) ("the question of consent may rightly be understood as a common question and the possibility that some class members may have consented is not sufficient to defeat class certification." (citations and quotation marks omitted)); *Ott v. Mortg. Inv'rs Corp. of Ohio*, 65 F. Supp. 3d 1046, 1067 (D. Or. 2014) ("unless and until [defendant] comes forward with some evidence that it received prior express consent before it called putative class members, there is no barrier to certification."); *see Silbaugh*, 278 F.R.D. at 393 ("[defendant] admitted . . . that he did not have consent from any person, or take steps to confirm that consent

was made. Having produced no evidence . . . defendant is unable to realistically argue that individual issues regarding consent outweigh the commonality."). Therefore, common questions within each of the three proposed Settlement Classes will predominate over any potential individualized issues.

2. A class action is the most efficient way of adjudicating the putative Settlement Class Members' claims and is superior to a multitude of individual lawsuits.

A class action is superior to any other method available to fairly and efficiently adjudicate the Settlement Class Members' claims. To determine whether a class action is a superior method, courts often look to whether it is an "efficient use of both judicial and party resources." *Hinman,* 545 F. Supp. 2d at 807. A class action is the superior method of resolving large scale claims if it will "achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Amchem*, 521 U.S. at 615. The superiority requirement is generally satisfied where class members have uniform claims governed by the same law. *In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1015 (7th Cir. 2002). Courts should also consider the "improbability that large numbers of class members would possess the initiative to litigate individually." *Haynes v. Logan Furniture*, 503 F.2d 1161, 1164-65 (7th Cir. 1974).

In consumer cases like this one with thousands of putative class members, a class action is especially likely to be superior:

> Rule 23(b)(3) was designed for situations such as this, in which the potential recovery is too slight to support individual suits, but injury is substantial in the aggregate. Reliance on federal law avoids the complications that can plague multistate classes under state law, and society may gain from the deterrent effect of financial awards.

*Murray v. GMAC Mortg. Corp.*, 434 F.3d 948, 953 (7th Cir. 2006). Because all of the Settlement Class Members' claims are brought pursuant to the same federal statute, this case is particularly

suited for class treatment. For this reason, class actions involving TCPA claims are routinely certified in the Seventh Circuit. *See, e.g.*, *Ira Holtzman,*, 728 F.3d at 684 (stating that "[c]lass certification is normal in litigation under § 227, because the main questions . . . are common to all recipients.").

Further, many putative Settlement Class Members may not have access to competent counsel willing to invest the time and resources necessary to prosecute their claims. Because the class members have little incentive to bring individual actions to recover "the relatively minimal amount of damages" available under the TCPA, they are unlikely to have an interest in individually controlling the prosecution of separate actions. *See Knutson v. Schwan's Home Serv., Inc.*, No. 3:12-cv-0964, 2013 WL 4774763, at *10 (S.D. Cal. Sept. 5, 2013) ("Given the relatively minimal amount of damages that an individual may recover in suing for violation of the TCPA, the Court finds a class action would achieve Plaintiffs' objective better than if class members were required to bring individual actions."). It is therefore unlikely that, absent a class action, individuals would be able to obtain relief through individual lawsuits. As such, adjudicating the Settlement Class Members' claims in a single proceeding will "save[] the resources of both the courts and the parties by permitting an issue potentially affecting every class member to be litigated in an economical fashion under Rule 23." *Gen. Tel Co. of Sw. v. Falcon*, 457 U.S. 147, 155 (1982). *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809 (1985) (holding that a class action is superior where it allows the plaintiffs to pool claims that would be uneconomical to litigate individually).

Moreover, because this litigation will settle if approved, the Court need not be concerned with issues of manageability relating to trial. When "confronted with a request for settlement only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems . . . for the proposal is that there be no trial." *Amchem*, 521 U.S.

at 620; *see also Am. Int'l Grp., Inc. v. ACE INA Holdings, Inc.*, No. 07 CV 2898, 2012 WL 651727, at *4 (N.D. Ill. Feb. 28, 2012) (*quoting Amchem*, 521 U.S. at 622 ("settlement is a factor in the calculus" in determining whether certification is proper)). Accordingly, a class action is the superior method of adjudicating this action.

### iv. *The proposed Notice Plan satisfies Due Process and the requirements of Federal Rule 23.*

When a class is certified through settlement, due process and Rule 23 require that the court "direct notice in a reasonable manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e) (1); *In re Sears, Roebuck & Co. Front-loading Washer Prod. Liab. Litig.*, No. 06 C 7023, 2016 WL 772785, at *7 (N.D. Ill. Feb. 29, 2016). Where, as here, a class is certified pursuant to Rule 23(b)(3), "the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B); *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173 (1974) ("[i]ndividual notice must be sent to all class members whose names and addresses may be ascertained through reasonable effort"). The notice must contain specific information in plain, easily understood language, including the nature of the action, the class definition(s), the claims, and the rights of class members. Fed. R. Civ. P. 23(c)(2)(B)(i)–(vii); *see In re AT&T*, 270 F.R.D. at 352.

As discussed above, the Parties have agreed to a comprehensive notice plan that more than satisfies the requirements of Due Process and Rule 23. The Settlement Agreement contemplates a multi-part notice plan designed to reach as many potential Settlement Class Members as possible. The Settlement Administrator estimates that the notice plan will result in a reach of over 70% of potential Settlement Class Members. Zavareei Decl. ¶ 46. Under the notice plan, the Settlement Administrator will send direct notice of the Settlement via email or U.S. Mail to Settlement Class

Members whose contact information can be located using Uber's records and reverse lookup technology. Because accurate contact information for some Settlement Class Members may not be readily available through Uber's records, the direct notice will be supplemented through publication notice, which will be published as soon as practicable after preliminary approval. "When individual notice is infeasible, notice by publication in a newspaper of national circulation . . . is an acceptable substitute." *Mirfasihi*, 356 F.3d at 786 ("[Individual] notice is preferable to newspaper or other collective notice but it was impossible here because [Defendant] has no record of those customers whose financial information it gave the telemarketers but who did not buy anything from the latter."). Publication notice will be thorough, and will proceed in a major print publication. Additionally, the Settlement Administrator will establish a website containing the relevant court documents, notices, and the Claim Form, and which provides for the online submission of claims. In compliance with Rule 23(e)(4), all of the notices will inform Settlement Class Members of their right to object or exclude themselves from the Settlement.

Finally, pursuant to the Class Action Fairness Act, 28 U.S.C. § 1715, and no later than ten days after filing the Agreement with the Court, Epiq, on behalf of Uber, will send required notice to the appropriate government entities. *Id.*, § 1715(b). Because the proposed notice plan effectuates direct notice to all class members identified by Uber's records, reaches other potential class members through publication notice and the Settlement Website, and fully apprises class members of their rights, it comports with the requirements of Due Process and Rule 23 and should be approved.

### v. *Plaintiffs' Counsel Should Be Appointed Class Counsel.*

Under Rule 23, "a court that certifies a class must appoint class counsel . . . [who] must fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(1)(B). In making this determination, the Court must consider counsel's work in identifying or investigating

potential claims; experience in handling class actions or other complex litigation, and the types of claims asserted in the case; knowledge of the applicable law; and resources committed to representing the class. Fed. R. Civ. P. 23(g)(1)(A)(i-iv).

As described in detail above, proposed Class Counsel have diligently investigated Plaintiffs' TCPA claims and the feasibility of class certification, and have devoted and will continue to devote substantial time and resources to this litigation. Proposed Class Counsel have extensive experience with similar class action litigation and have been appointed class counsel in many class actions, including many TCPA cases. As such, Proposed Class Counsel have an in-depth knowledge of the laws applicable to the Settlement Class Members' claims and certification of the Settlement Classes. *See* Zavareei Decl., Ex. 2; McGuire Decl., Ex. 3.[9] Accordingly, the Court should appoint Plaintiffs' Counsel to serve as Class Counsel for the proposed Settlement Classes pursuant to Rule 23(g).

## V.   **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court enter an Order (1) granting preliminary approval of the proposed Settlement; (2) appointing Plaintiffs Maria Vergara, James Lathrop, Sandeep Pail, Jennifer Reilly, Justin Bartolet and Jonathan Grindell as Class Representatives; (3) appointing Hassan A. Zavareei, Andrea R. Gold, and Andrew Silver of Tycko & Zavareei LLP and Myles McGuire, Evan M. Meyers and Paul T. Geske of McGuire Law, P.C. as Class Counsel; (4) approving the form and content of the proposed notice and ordering that it be effectuated; (5) scheduling a final approval hearing; and (6) providing such other and further relief as the Court deems reasonable and just.

---

[9] Attached to the Declarations of Hassan A. Zavareei and Myles McGuire are firm resumes for Class Counsel, which provide additional detail as to their significant experience and expertise in related class action litigation.

Dated:  August 11, 2017

Respectfully submitted,

MARIA VERGARA, JAMES LATHROP, SANDEEP PAL, JENNIFER REILLY, JUSTIN BARTOLET, and JONATHAN GRINDELL, individually and on behalf of classes of similarly situated individuals

By: /s/ *Paul T. Geske*
One of Plaintiffs' Attorneys

Myles McGuire
Evan M. Meyers
Paul T. Geske
MCGUIRE LAW, P.C.
55 W. Wacker Drive, 9th Floor
Chicago, IL 60601
Tel: (312) 893-7002
Fax: (312) 275-7895
mmcguire@mcgpc.com
emeyers@mcgpc.com
pgeske@mcgpc.com

Hassan A. Zavareei (*pro hac vice*)
Andrea R. Gold (*pro hac vice*)
Andrew J. Silver (*pro hac vice*)
TYCKO & ZAVAREEI LLP
1828 L Street, N.W., Suite 1000
Washington, DC 20036
Tel.: (202) 973-0900
Fax: (202) 973-0950
hzavareei@tzlegal.com
agold@tzlegal.com
asilver@tzlegal.com

## CERTIFICATE OF SERVICE

I hereby certify that on August 11, 2017, I electronically filed the foregoing *Plaintiffs'* Unopposed *Motion for Preliminary Approval of Class Action Settlement* with the Clerk of the Court using the CM/ECF system. A copy of said document will be electronically transmitted to all counsel of record.

/s/ *Paul T. Geske*