# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| MARIA VERGARA, SANDEEP PAL, JENNIFER REILLY, JUSTIN BARTOLET, JAMES LATHROP, and JONATHAN GRINDELL, individually and on behalf of similarly situated individuals, | ) ) ) ) ) ) | |
| *Plaintiffs*, | ) ) | No. 15-cv-06942 |
| v. | ) ) | Hon. Thomas M. Durkin |
| UBER TECHNOLOGIES, INC., a Delaware corporation, | ) ) ) | |
| *Defendant*. | ) ) | |

## PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT

Myles McGuire
Evan M. Meyers
Paul T. Geske
MCGUIRE LAW, P.C.
55 W. Wacker Dr., 9th Fl.
Chicago, IL 60601
Tel: (312) 893-7002
Fax: (312) 275-7895
mmcguire@mcgpc.com
emeyers@mcgpc.com
pgeske@mcgpc.com

Hassan A. Zavareei
Andrea R. Gold
Andrew J. Silver
TYCKO & ZAVAREEI LLP
1828 L Street NW, Ste. 1000
Washington, DC 20036
Tel: (202) 973-0900
Fax: (202) 973-0950
hzavareei@tzlegal.com
agold@tzlegal.com
asilver@tzlegal.com

*Counsel for Plaintiffs and Class Counsel*

## TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................................... 1

II.     BACKGROUND ....................................................................................................... 3

III.    SETTLEMENT TERMS ........................................................................................... 5

        A.  The Proposed Settlement Classes ................................................................. 5

        B.  Monetary Relief ............................................................................................ 5

        C.  Prospective Relief ........................................................................................ 6

        D.  Notice And Settlement Administration ........................................................ 7

        E.  Opt-Out And Objection Procedure ............................................................... 7

        F.  Attorney's Fees and Incentive Awards ........................................................ 8

        G.  Release of Liability ...................................................................................... 8

IV.     DISCUSSION ........................................................................................................... 9

        A.  The Settlement's Notice Plan Satisfies Due Process .................................. 9

        B.  The Settlement Warrants Final Approval ................................................... 11

                1.  The Settlement provides substantial value, especially in light of the risks
                    of continued litigation ..................................................................... 13

                2.  Continued litigation would increase the complexity, length, and
                    expense of litigation ........................................................................ 17

                3.  The lack of any real opposition to the Settlement demonstrates the Settlement
                    Class Members' unqualified support for the settlement and supports final
                    approval ............................................................................................ 18

                4.  The opinion of competent counsel favors approval .......................... 25

                5.  The stage of the proceedings and the amount of discovery completed also weigh
                    in favor of final approval ................................................................. 26

        C.  The Court Should Also Approve Plaintiffs' Request For Attorney's Fees,
            Costs, And Incentive Awards ..................................................................... 28

V.     CONCLUSION.................................................................................................................29

# TABLE OF AUTHORITIES

**Case**                                                                      **Page(s)**

## United States Supreme Court Cases:

*Campbell-Ewald Co. v. Jose Gomez,*
    136 S. Ct. 663 (2016)..................................................................26

*Eisen v. Carlisle & Jacquelin,*
    417 U.S. 156 (1974)....................................................................9

## United States Circuit Court of Appeals Cases:

*ACA Int'l v. FCC,*
    No. 15- 1211 (D.C. Cir.) ...........................................................16

*Burns v. Elrod,*
    757 F.2d 151 (7th Cir. 1985) ......................................................9

*Donovan v. Robbins,*
    752 F.2d 1170 (7th Cir. 1985) ..................................................12

*Eubank v. Pella Corp. et al.,*
    753 F.3d 718 (7th Cir. 2014) ....................................................13

*Gannon v. Network Tele. Servs., Inc.,*
    628 F. App'x 551 (9th Cir. 2016) ..............................................15

*Gene & Gene LLC v. BioPay LLC,*
    541 F.3d 318 (5th Cir. 2008) ....................................................15

*Hughes v. Kore of Indiana Enter., Inc.,*
    731 F.3d 672 (7th Cir. 2013) ......................................................9

*Isby v. Bayh,*
    75 F.3d 1191 (7th Cir. 1996) ....................................11, 12, 25, 26

*Mirfasihi v. Fleet Mortg. Corp.,*
    356 F.3d 781 (7th Cir. 2004) ....................................................10

*Patrick Cotter v. Lyft, Inc.,*
    No. 17-15724, Dkt. 10 (9th Cir. 2017) ......................................21

*Reynolds v. Beneficial Nat'l Bank,*
    288 F.3d 277 (7th Cir. 2002) ....................................................13

*Synfuel Techs., Inc. v. DHL Express (USA), Inc.*,
   463 F.3d 646 (7th Cir. 2006) ................................................................ *passim*

*Uhl v. Thoroughbred Tech. & Telecomms., Inc.*,
   309 F.3d 978 (7th Cir. 2002) ........................................................................11

*Wright v. Nationstar Mortg., LLC*,
   No. 16-3537, 2016 WL 9752125 (7th Cir. Oct. 21, 2016) .............................19

*Wright v. Nationstar Mortg., LLC*,
   No. 16-3537, 2016 WL 9752126 (7th Cir. Oct. 25, 2016) .............................19

**<u>United States District Court Cases:</u>**

*Am. Int'l Grp., Inc. v. ACE INA Holdings, Inc.*,
   No. 07 CV 2898, 09 C 2026, 2012 WL 651727 (N.D. Ill. 2012) ...................13

*Aranda v. Caribbean Cruise Line, Inc.*,
   No. 12 C 4069, 2017 WL 1369741 (N.D. Ill. 2017)...............................23, 24

*Arthur v. Sallie Mae, Inc.*,
   No. C10-0198JLR, 2012 WL 90101 (W.D. Wash. 2012) ..............................16

*Brown v. Hain Celestial Grp., Inc.*,
   No. 3:11-cv-03082-LB, 2016 WL 631880 (N.D. Cal. 2016) .........................20

*CE Design v. Beaty Const., Inc.*,
   No. 07 C 3340, 2009 WL 192481 (N.D. Ill. 2009)...........................................9

*Chambers v. Whirlpool Corp.*,
   214 F. Supp. 3d 877 (C.D. Cal. 2016) ....................................................20, 21

*Cody v. SoulCycle, Inc.*,
   No. 15-cv-6457, Dkt. 254 (C.D. Cal.  2017) ..................................................22

*Fields v. Mobile Messengers Am., Inc.*,
   No. C 12-05160, 2013 WL 6073426 (N.D. Cal. 2013) ..................................15

*Gehrich v. Chase Bank USA, N.A.*,
   316 F.R.D. 215 (N.D. Ill. 2016)....................................................................19

*Hendricks v. Starkist Co.*,
   No. 13-cv-00729, Dkt. 299, 373 (N.D. Cal. 2015) .........................................22

*Hispanics United v. Vill. of Addison*,
   988 F. Supp. 1130 (N.D. Ill. 1997) ...............................................................25

*In re AT&T Mobility Wireless Data Servs. Sales Litig.*,
   270 F.R.D. 330 (N.D. Ill. 2010)..........................................................9, 13, 27

*In re AT&T Mobility Wireless Data Servs. Sales Litig.*,
   789 F. Supp. 2d 935 (N.D. Ill. 2011) ....................................................12, 13, 18

*In re Capital One Telephone Consumer Protection Act Litig.*,
   80 F. Supp. 3d 781 (N.D. Ill. 2015) ...........................................................13, 19

*In re Carrier IQ, Inc., Consumer Privacy Litig.*,
   No. 12-md-02330-EMC, 2016 WL 4474366 (N.D. Cal. 2016)................20, 21

*In re Checking Account Overdraft Litig.*,
   830 F. Supp. 2d 1330 (S.D. Fla. 2011) ...........................................................23

*In re Checking Account Overdraft Litig.*,
   No. 09-md-2036, Dkt. 3698 (S.D. Fla. 2013) .................................................22

*In re Initial Pub. Offering Sec. Litig.*,
   728 F. Supp. 2d 289 (S.D.N.Y. 2010).............................................................23

*In re Jiffy Lube Int'l, Inc. Text Spam Litig.*,
   No. 3:11-MD-02261, Dkt. 97 (S.D. Cal. 2013) ..............................................16

*In re Magsafe Apple Power Adapter Litig.*,
   No. 09-cv-1911, Dkt. 86 (N.D. Cal. 2012) .....................................................22

*In re Mexico Money Transfer Litig.*,
   164 F. Supp. 2d 1002 (N.D. Ill. 2000) ......................................................17, 18

*In re Polyurethane Foam Antitrust Litig.*,
   178 F. Supp. 3d 635 (N.D. Ohio 2016).....................................................20, 23

*In re Sears, Roebuck & Co. Front-loading Washer Prod. Liab. Litig.*,
   No. 06 C 7023, 2016 WL 772785 (N.D. Ill. 2016)...........................................9

*In re Southwest Airlines Voucher Litig.*,
   No. 11-cv-8176, 2013 WL 4510197 (N.D. Ill. 2013) ......................................13

*In re TRS Recovery Servs., Inc. and Telecheck Servs., Inc. FDCPA Litig.*,
   No. 2:13-MD-2426-DBH, 2016 WL 543137 (D. Maine 2016)......................21

*In re Yahoo Mail*,
   2016 WL 4474612 (N.D. Cal. 2016) ........................................................20, 21

*Kaufman v. Am. Express Travel Related Servs. Co., Inc.*,
   264 F.R.D. 438 (N.D. Ill. 2009).......................................................................10

*Kazemi v. Payless Shoesource, Inc.*,
   No. 3:09-cv-05142, Dkt. 94 (N.D. Cal. 2012) ................................................16

*Kolinek v. Walgreen Co.*,
　　311 F.R.D. 483 (N.D. Ill. 2015)..........................................................13, 16, 19

*Lathrop v. Uber Techs., Inc.*,
　　No. 3:14-cv-05678-JST, Dkt. 49 (N.D. Cal. 2015)....................................4, 15

*Larsen v. Trader Joe's Co.*,
　　No. 11-cv-05188-WHO, 2014 WL 3404531 (N.D. Cal. 2014) ......................22

*Legg v. Spirit Airlines, Inc.*,
　　No. 14-cv-61978, Dkt. 141 (S.D. Fla. 2016) ..................................................22

*McKenna v. WhisperText*,
　　No. 5:14-cv-00424-PSG, 2015 WL 5264750 (N.D. Cal. 2015) ......................14

*Melito v. Am. Eagle Outfitters, Inc.*,
　　No. 14-cv-2440, Dkt. 275 (S.D.N.Y 2017).....................................................22

*Patrick Cotter v. Lyft, Inc.*,
　　No. 13-cv-4065, Dkt. 264 (N.D. Cal. 2016) ...................................................22

*Roberts v. Electrolux Home Prods., Inc.*,
　　No. SACV-12-1644-CAS(VBKx), 2014 WL 4568632 (C.D. Cal. 2014) .20, 21

*Schulte v. Fifth Third Bank*,
　　805 F. Supp. 2d 560 (N.D. Ill. 2011) ..................................................12, 17, 25

*Sherman v. Yahoo! Inc.*,
　　No. 13-cv-0041, 2015 WL 5604400 (S.D. Cal. 2015)....................................15

*Spann v. J.C. Penney Corp.*,
　　211 F. Supp. 3d 1244 (C.D. Cal. 2016) ....................................................20, 21

*Warciak v. Nikil, Inc.*,
　　No. 16 C 5731, 2017 WL 1093162 (N.D. Ill. 2017).......................................14

*Wilkins v. HSBC Bank Nevada, N.A. et al.*,
　　No. 14 C 190, 2015 WL 890566 (N.D. Ill. 2015)....................................16, 19

*Wright v. Nationstar Mortgage LLC*,
　　No. 14 C 10457, 2016 WL 4505169 (N.D. Ill. 2016)......................................19

**Statutes and Court Rules:**

Class Action Fairness Act, 28 U.S.C. § 1715 .......................................................11

Fed. R. Civ. P. 23 ............................................................................ *passim*

Telephone Consumer Protection Act, 47 U.S.C. §227 ................................ *passim*

**Other Authorities:**

A. Conte & H. Newberg, *Newberg on Class Actions*, § 11.42 (4th ed. 2002).......12

Barbara J. Rothstein & Thomas E. Willging, *Managing Class Action Litigation: A Pocket Guide for Judges* 17 (Fed. Jud. Ctr., 3rd ed. 2010), *available at* http://www.fjc.gov/public/pdf.nsf/lookup/classgd3.pdf/$file/classgd3.pdf.....24

Fitzpatrick, Brian T., *The End of Objector Blackmail?*, 62 VAND. L. REV. 1623, 1624–25, 1633–41 (2009) .............................................................................22

*Kerry Ann Sweeney*, Serial Objector Index, http://www.serialobjector.com/persons/155 (last updated Dec. 23, 2017)......21

Nereida Moreno, *Uber reaches $20 million settlement in class-action lawsuit over text messages*, ChicagoTribune.com (Oct. 9, 2017), http://www.chicagotribune.com/business/ct-biz-uber-settlement-1010-story.html .......................................................................................................11

## I.  <u>INTRODUCTION</u>

Plaintiffs, Maria Vergara, Sandeep Pal, Jennifer Reilly, Justin Bartolet, James Lathrop, and Jonathan Grindell, as Class Representatives of the Settlement Classes, and pursuant to Fed. R. Civ. P. 23(e), respectfully submit this memorandum of law in support of their motion for final approval of the Parties' Class Action Settlement Agreement.[1] Upon final approval, the Settlement will provide Settlement Class Members with substantial financial compensation and meaningful prospective relief that they otherwise could not have achieved on their own. As explained in detail below, the terms of the Settlement that Class Counsel and the Class Representatives have obtained on behalf of the Settlement Class Members are fair, reasonable, and adequate, and have been met with strong support from the Settlement Class Members.

Through a combination of direct notice by email and mail, and publication notice appearing online and in print, notice of the Settlement has reached approximately 90.6% of Settlement Class Members across the country.[2] By the close of the claims period, 103,485 putative Settlement Class Members filed claims seeking to participate in the Settlement, and only 49 individuals elected to opt out. (Azari Decl., ¶¶ 39–40). The Settlement has the overwhelming support of the Settlement Class Members. Indeed, only one person is objecting to the Settlement—a serial objector with a history of filing frivolous objections, not one of which has ever been sustained.[3] This sole objection relates only to the request for attorney's fees and, as explained in more detail below, the objection is factually inaccurate and legally without merit. In any event, there is no objection to the overall

---

[1] Unless stated otherwise, capitalized defined terms are intended to have the same meanings given to them in the Parties' Settlement Agreement, attached hereto as <u>Exhibit A</u>.

[2] *See* Declaration of Cameron R. Azari, Esq. on Implementation and Adequacy of Settlement Notices and Notice Plan ¶¶ 14, 40, attached hereto as <u>Exhibit B</u> (hereinafter "Azari Declaration" or "Azari Decl.").

[3] Initially, one other individual objected to the Settlement, but she subsequently asked the Court to approve her request to withdraw her objection because, upon further consideration, she concluded "this [is] an excellent settlement." (*See* Dkts. 97–98).

fairness of the Settlement, the notices, the Class Representative Incentive Awards, or the request for costs.

This overwhelmingly positive response from the Settlement Class Members is unsurprising given that the Settlement is an excellent result. The Settlement provides for creation of a $20,000,000 Settlement Fund to compensate Settlement Class Members who have filed valid claims—each is eligible to receive a pro rata share of the Settlement Fund following subtractions for the costs of notice and administration, attorney's fees and expenses, and incentive awards for the Class Representatives.

The Settlement and the relief it provides are a terrific outcome for the Settlement Classes given the significant risks involved in continued litigation. Class Counsel and the Class Representatives brought this litigation against a defendant with substantial resources, strong legal defenses, and a willingness to litigate through trial and appeals. Had Defendant prevailed either on the merits or in defeating class certification, the Settlement Class Members would have received nothing.

In short, this Settlement favorably resolves nearly three years of contentious litigation spanning multiple courts across the country, bringing certainty, closure, and valuable relief for consumers nationwide. The Settlement has received overwhelming support from the Settlement Class Members and will result in significant monetary and non-monetary relief if finally approved. The Settlement meets or exceeds applicable standards and is fair, adequate, and reasonable. Accordingly, Plaintiffs respectfully request that the Court (1) grant final approval to the Settlement; (2) find that adequate notice was provided to the Settlement Class Members; and (3) approve the Plaintiffs' request for attorney's fees, costs, and incentive awards.

## II.    **BACKGROUND**

The Settlement before the Court resolves claims against Defendant, Uber Technologies, Inc. ("Uber"), for allegedly sending unsolicited automated text messages in violation of the federal Telephone Consumer Protection Act (the "TCPA"), 47 U.S.C. § 227 *et seq*. Uber is an international technology company and the developer of the Uber mobile app, a smartphone application that connects available drivers with passengers seeking transportation. The Uber app functions like a taxi-style transportation service, allowing a user to submit a trip request, which is sent to a driver who then uses his or her own automobile to transport the rider to the requested destination.

One of the primary ways in which Uber communicates with app users and prospective app users is through text messages sent to individuals' cellphones. Uber's phenomenal growth as a company has been dependent on its ability to attract drivers and riders to its service, and text messaging is central to Uber's marketing. Accordingly, the breadth and depth of Uber's text messaging platform is vast, with the capability to deliver millions of text messages every year to users and drivers in virtually every major metropolitan area across the country.

As alleged in Plaintiffs' First Amended Class Action Complaint, Uber carried out its text messaging activities without implementing effective procedures and safeguards to ensure that it complied with the TCPA. (*See generally* Dkt. 82). Plaintiffs also alleged that Uber routinely sent automated text messages to cellphones belonging to individuals who never gave valid prior express consent to Uber as required under the TCPA. (*Id.*). Further, Plaintiffs alleged that Uber often failed to effectively process and honor individuals' opt-out requests, and continued to send automated text messages to individuals who complained or repeatedly attempted to revoke consent to receive such messages. (*Id.*).

Uber's text messaging practices spawned nationwide litigation, with multiple putative class

actions filed in courts across the country. This nationwide Settlement Agreement was reached with Class Counsel, who represent the plaintiffs in the oldest and most procedurally advanced TCPA cases against Uber. Plaintiffs Jonathan Grindell and James Lathrop filed suit against Uber nearly three years ago in the United States District Court for the Northern District of California relating to Uber's alleged violations of the TCPA. (*Lathrop v. Uber Techs., Inc.*, No. 3:14-cv-05678-JST, Dkt. 1). Plaintiffs Sandeep Pal, Jennifer Reilly, and Justin Bartolet joined the *Lathrop* suit a few weeks later. (*Lathrop*, Dkts. 9–10). These plaintiffs ("California plaintiffs") are all individuals who received unwanted text messages from Uber related to becoming a driver for Uber. Plaintiff Vergara filed her lawsuit against Uber in this Court on August 7, 2015, alleging that she received numerous unsolicited text messages from Uber despite never having expressed any interest in being an Uber driver or rider. (*See generally* Dkt. 1; Dkt. 82 ¶¶ 32–35).

In both the California litigation and Illinois litigation, Class Counsel developed and prosecuted complex claims in the face of relentless opposition from Uber. As the parties awaited a ruling on Uber's Motion for Judgment on the Pleadings in the Illinois litigation, and as proceedings in the California litigation neared class certification and a second motion for summary judgment (the first motion was briefed and rejected by the district court as premature), the Parties began to explore settlement. During this important inflection point in the cases, the Parties agreed to conduct a mediation to determine whether a settlement could be reached to avoid the uncertainties and risks of a ruling on the Motion for Judgment on the Pleadings in the Illinois litigation and on class certification or summary judgment in the California litigation.

On May 23, 2017, the Parties' counsel attended a full-day mediation in California with the Hon. Layn R. Phillips (Ret.) of Phillips ADR, a former United States District Court Judge with expertise in complex class action litigation. After a full day of rigorous negotiation at the

mediation, and numerous settlement discussions over the following weeks, the Parties finally agreed on the Settlement Agreement for which Plaintiffs now seek final approval.

## III.   SETTLEMENT TERMS

### A.   The Proposed Settlement Classes.

When the Court granted preliminary approval to the Settlement, the Court certified the following three Settlement Classes for the Class Period (December 31, 2010 – August 17, 2017):

> Class A:  All persons or entities within the U.S. who, during the Class Period, used or subscribed to a wireless or cellular service who were sent one or more non-emergency text messages, utilizing Twilio, Inc.'s system, in connection with Uber's Refer-a-Friend program.

> Class B:  All persons or entities within the U.S. who, during the Class Period, started Uber's driver partner application process but did not become an "active" driver in Uber's system, who used or subscribed to a wireless or cellular service, and to whom Uber sent one or more non-emergency text messages after the user or subscriber requested Uber to discontinue sending text messages.

> Class C:  All persons or entities in the U.S. who, during the Class Period, were not party to a contract with Uber and/or who did not provide his or her cellular phone number to Uber, and who used or subscribed to a cellular telephone number to which Uber sent one or more non-emergency text messages.

(Dkt. 88 ¶ 2). Expressly excluded from the Settlement Classes are all persons who opt out, the Court and staff to whom this case is assigned, and any member of the Court's or staff's immediate family. (*Id.*). These exclusions are standard in class action settlement agreements generally and do not materially change the makeup of the Settlement Classes.

### B.   Monetary Relief.

As part of the Settlement, Uber has agreed to establish a $20,000,000 cash Settlement Fund. (Exh. A ¶ 45). The entire amount of the Settlement Fund will be distributed *pro rata* to Settlement Class Members whose claims are approved, after deductions for the costs of notice and administration, attorney's fees and costs, and incentive awards to Plaintiffs. (*Id.* ¶¶ 45–47). Each

Settlement Class Member was allowed to submit one claim. (*Id.*).

Because the Settlement Fund is to be distributed to Settlement Class Members *pro rata*, the amount of each individual payment will ultimately depend on the number of approved claims. (*Id.*) This amount is not yet final, because the Settlement Administrator is still processing and reviewing submitted claims. By the claims deadline, 103,485 claims had been filed. (Azari Decl., ¶ 40). If all of these claims were approved, individual payments to the Settlement Class Members would amount to $120.66 (accounting, as outlined in Plaintiffs' Motion for Attorneys' Fees, for the estimated costs of notice and administration, attorney's fee and expense requests, and requested incentive payments to Class Representatives). However, it is likely that some claims are invalid, and as a result the amount of each individual payment will likely be higher at the time when funds are distributed. Regardless, all Settlement Class Members should receive in excess of $120.

### C. Prospective Relief.

In response to this litigation, Uber has already carried out changes designed to more faithfully honor text message recipients' opt-out requests. In addition, as part of the Settlement, Uber has agreed to implement and maintain changes to its practices, resulting in significant non-monetary, prospective relief. Uber has agreed that, for at least two years after the Settlement goes into effect, it will abide by certain practices designed to reduce or eliminate unauthorized and misdirected text messages. (Exh. A ¶ 48).

First, Uber has agreed to completely discontinue its Refer-a-Friend program on cellular phones that Uber issues to requesting drivers. (Exh. A ¶ 48). Second, Uber has agreed to maintain the robust opt-out protocol that it instituted in response to this litigation. (*Id.*). At a minimum, this opt-out protocol entails utilizing a broad set of opt-out terms that Uber's system is capable of recognizing, which will facilitate the Uber system's ability to correctly identify and abide by

recipients' attempts to revoke consent to receive future messages. (*Id.*). Third, Uber has agreed to adhere to several account creation and signup processes to help reduce the incidence of contacting incorrect phone numbers. (*Id.*). These processes include confirmatory steps that ask users to verify the phone number they input during account signup, and automatic deletion of any unverified numbers. (*Id.*). Together, these processes will reduce or eliminate text messages like those at issue in this litigation, and will benefit the Settlement Class Members and the public at large.

> **D.      Notice And Settlement Administration.**

The Parties agreed to retain Epiq Systems Class Action and Claims Solutions ("Epiq") as the Settlement Administrator. Epiq has been responsible for effectuating class notice, receiving Claim Forms submitted by Settlement Class Members, and determining whether all submitted information is complete and accurate. (Exh. A ¶¶ 36, 47, 57–59). Uber has agreed to pay from the Settlement Fund the costs of effectuating the Court-approved Notice Plan, processing and paying valid claims, and all other expenses incurred by the Settlement Administrator in administering the Settlement. The Notice Plan is described in greater detail below.

> **E.      Opt-Out And Objection Procedure.**

Putative Settlement Class Members were notified of their opportunity to exclude themselves from the Settlement or object to its approval. (*Id.* ¶¶ 60–66). The procedures and deadlines for filing opt-out requests and objections were referenced in all forms of the notice and on the Settlement Website. (*Id.*; *see also id.* at Exhs. 4–6 to Exh. A). As to objecting, the notices informed Settlement Class Members that they would have an opportunity to appear and have their objections heard at the Final Approval Hearing. (Exh. A ¶¶ 60–66). The notices also informed putative Settlement Class Members that they will be bound by the Settlement's Release unless they timely exercised their right to be excluded. (*Id.*). At the conclusion of the claims period and

objection deadline, 49 putative Settlement Class Members had elected to opt out, and at present there is only one pending objection to the Settlement. (Azari Decl. ¶ 39).

### F. Attorney's Fees And Incentive Awards.

Subject to Court approval, attorney's fees and incentive awards are to be paid out of the Settlement Fund. (Exh. A ¶¶ 45, 78). Class Counsel's requested fees, costs, and incentive awards are detailed in Plaintiffs' Unopposed Motion for Approval of Attorneys' Fees, Expenses, and Incentive Awards, filed on November 15, 2017. (Dkt. 93, hereinafter the "Motion for Attorneys' Fees"). As explained in that Motion, Class Counsel agreed as part of the Settlement to limit their request for attorney's fees to no more than 33.3% of the total Settlement Fund, or $6,660,000. (Exh. A ¶ 78). Class Counsel ultimately sought less than this amount, requesting a risk-adjusted fee award of $6,350,000 pursuant to the tiered formula that courts in this District have adopted for TCPA class actions (36% of the Settlement Fund's first $10 million plus just under 31% of the remaining $9,043,000 after subtraction of administrative expenses and incentive awards). (Dkt. 93, at 17). Class Counsel also requested that the Court approve incentive awards to the named Plaintiffs of $10,000 each, and Class Counsel's reasonable litigation expenses of $205,732.48. (*Id.* ¶¶ 30–33). Uber does not oppose any of these requests.

### G. Release of Liability.

In exchange for the monetary and prospective relief described above, each Settlement Class Member who has not excluded himself or herself will be deemed to have released and forever discharged Uber and the other "Releasees" (e.g. Uber's affiliates) from any claims related to or arising out of sending a text or SMS message relating to Uber without their consent. (Dkt. 93, at ¶¶ 49–54).

IV. **DISCUSSION**

A. **The Settlement's Notice Plan Satisfies Due Process.**

When a class is certified through settlement, due process and Rule 23 require that the court "direct notice in a reasonable manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1); *In re Sears, Roebuck & Co. Front-loading Washer Prod. Liab. Litig.*, No. 06 C 7023, 2016 WL 772785, at *7 (N.D. Ill. Feb. 29, 2016). Where, as here, a class is certified under Rule 23(b)(3), "the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B); *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173 (1974) ("[i]ndividual notice must be sent to all class members whose names and addresses may be ascertained through reasonable effort"). The class notices must clearly state in plain, easily understood language the details of the proposed settlement, including the nature of the action, the class definition(s), the claims, and the class members' rights. Fed. R. Civ. P. 23(c)(2)(B)(i)–(vii); *In re AT&T Mobility Wireless Data Servs. Sales Litig.*, 270 F.R.D. 330, 350-51 (N.D. Ill. 2010).

Rule 23's requirement that the class members receive the "best notice that is practicable" does not mandate that every individual class member actually receive direct notice. *See Burns v. Elrod*, 757 F.2d 151, 154 (7th Cir. 1985) (noting that "Rule 23 does not require defendants to exhaust every conceivable method of identification"); *CE Design v. Beaty Const., Inc.*, No. 07 C 3340, 2009 WL 192481, at *10 (N.D. Ill. Jan. 26, 2009) ("The Federal Rules [] require the best notice that is 'practicable' not perfect notice. The word 'practicable' implies that the plaintiff should be afforded some flexibility with respect to providing notice to unknown, potential class members."). Class members who cannot be identified through reasonable effort can be notified by publication. *Hughes v. Kore of Indiana Enter., Inc.*, 731 F.3d 672, 677 (7th Cir. 2013).

In this case, the comprehensive Notice Plan implemented following preliminary approval satisfies the requirements of due process and Rule 23. The Settlement's multi-part Notice Plan included a combination of direct notice by email and U.S. mail and publication notice appearing online and in print. (Azari Decl. ¶¶ 17–38). The Settlement Administrator sent direct notice by email to 6,477,230 email addresses associated with phone numbers contained in Uber's records. (*Id.* ¶ 23). The Settlement Administrator also mailed 514,973 postcard notices to individuals could not be reached by email. (*Id.* ¶¶ 18–20).[4] The notices contained the information required under Rule 23(c)(2)(B) and invited the recipients to visit the Settlement Website or call a toll-free number where they could obtain additional information and get answers to frequently asked questions. (*Id.* ¶¶ 34–38).

The Notice Plan's robust publication notice supplemented the direct notice in order to reach as many potential Settlement Class Members as possible.[5] *See Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781, 786 (7th Cir. 2004) ("When individual notice is infeasible, notice by publication in a newspaper of national circulation . . . is an acceptable substitute.") (citations omitted). The Settlement's publication notice appeared in print in *USA Today* and online via the Settlement Website, internet banner ads, and sponsored search listings. (Azari Decl. ¶¶ 27–36); *Kaufman v. Am. Express Travel Related Servs. Co., Inc.*, 264 F.R.D. 438, 446 (N.D. Ill. 2009) (citing *Mirfasihi*, 356 F.3d at 786) ("Publication of notice in a national newspaper of wide circulation, plus an online publication, constitutes sufficient notice by publication.")

All of the notices directed the Settlement Class Members to visit the Settlement Website,

---

[4] Many of these individuals' addresses were obtained through a "reverse-lookup" performed using their phone numbers.

[5] The online and publication notice is particularly useful in cases in which people have moved or changed their contact information or, where in the case of a text being sent someone without a relationship to Uber (*e.g.*, a text sent to a wrong number because of user error), the settlement administrator does not have a ready means to provide direct notice.

where they could view a long-form version of the notice and important court documents, and submit a claim form online. (Azari Decl. ¶¶ 34–36). As of January 3, 2018, there were over 217,669 unique visitors to the Settlement Website. (*Id.* ¶ 36). The Settlement Administrator also issued a press release to 5,000 general media outlets and 5,400 online databases and websites, resulting in substantial press coverage that furthered the reach of publication notice.[6] (*Id.* ¶¶ 32-33).

Pursuant to Rule 23(e)(4), all of the Court-approved notices informed the Settlement Class Members of their right to object or exclude themselves from the Settlement. Additionally, the Settlement Administrator provided notice of the Settlement to the appropriate state and federal officials pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1715, and no comments or opposition from those governmental entities was received.

Through the Notice Plan's combination of direct mail and email notice, along with online and print publication notice, the Notice Plan succeeded in reaching an impressive 90.6% of the overall potential Settlement Class Members. (Azari Decl. ¶¶ 40-41). In sum, because the Settlement's multi-part Notice Plan included direct notice to all Settlement Class Members who could be reasonably identified using Uber's records, reached additional Settlement Class Members through publication notice and the Settlement Website, and fully apprised Settlement Class Members of their rights, it satisfies the requirements of due process and Rule 23.

**B.    The Settlement Warrants Final Approval.**

Before the claims, issues, or defenses of a certified class may be settled, the court must conduct a hearing to determine whether the settlement is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e); *Isby v. Bayh*, 75 F.3d 1191, 1196 (7th Cir. 1996); *Uhl v. Thoroughbred Tech. &*

---

[6] *See, e.g., Nereida Moreno, Uber reaches $20 million settlement in class-action lawsuit over text messages, ChicagoTribune.com (Oct. 9, 2017), http://www.chicagotribune.com/business/ct-biz-uber-settlement-1010-story.html.*

*Telecomms., Inc.*, 309 F.3d 978, 986 (7th Cir. 2002) (holding that a court's final approval inquiry is "limited to [consideration of] whether the settlement is lawful, fair, reasonable and adequate"). Courts generally approach this inquiry with a presumption in favor of approving the settlement. *Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 578 (N.D. Ill. 2011) ("Federal courts naturally favor the settlement of class action litigation.") (quoting *Isby*, 75 F.3d at 1196); *see also Donovan v. Robbins*, 752 F.2d 1170, 1177 (7th Cir. 1985); A. Conte & H. Newberg, *Newberg on Class Actions* (4th ed.) § 11.42.

The Seventh Circuit has articulated five factors for district courts to consider in determining whether to finally approve a class action settlement: (i) the strength of a plaintiff's case compared to the amount of the defendant's settlement offer; (ii) an assessment of the likely complexity, length, and expense of the litigation; (iii) an evaluation of the amount of opposition to the settlement among affected parties; (iv) the opinion of competent counsel; and (v) the stage of the proceedings and amount of discovery completed at the time of settlement. *Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 653 (7th Cir. 2006) (citation and internal quotations omitted); *In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.*, 789 F. Supp. 2d 935, 958 (N.D. Ill. 2011).

Here, the lengthy duration of the litigation; the extensive investigation and discovery process; the highly contested settlement negotiations; the excellent result for the Settlement Class Members in spite of significant procedural and substantive hurdles faced by the Class Representatives; and the participation of an experienced mediator throughout the negotiation process are all testament to the fairness and non-collusive nature of the Settlement. As explained below, the five factors courts consider at the final approval stage strongly favor approving the Settlement in this case.

1. **The Settlement provides substantial value, especially in light of the risks of continued litigation.**

"The most important factor relevant to the fairness of a class action settlement is the first one listed: the strength of plaintiff's case on the merits balanced against the amount offered in the settlement." *In re AT&T*, 789 F. Supp. 2d at 958 (quoting *Synfuel*, 463 F.3d at 653) (internal quotations omitted). The strength of a plaintiff's case can be quantified by comparing "the net expected value of continued litigation to the class" to the "range of possible outcomes and ascrib[ing] a probability to each point on the range." *Am. Int'l Grp., Inc. v. ACE INA Holdings, Inc.*, No. 07 CV 2898, 09 C 2026, 2012 WL 651727, at *2 (N.D. Ill. Feb. 28, 2012) (quoting *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 284–85 (7th Cir. 2002) and *Synfuel*, 463 F.3d at 653); *see also Eubank v. Pella Corp. et al.*, 753 F.3d 718, 727 (7th Cir. 2014) (holding that the district court should "estimate the likely outcome of a trial . . . in order to evaluate the adequacy of the settlement").

However, "[t]he Seventh Circuit has recognized that valuing hypothetical continued litigation is necessarily speculative and therefore an inexact science," and courts need only "estimate and come to a ballpark valuation" of the class's claims. *Kolinek v. Walgreen Co.*, 311 F.R.D. 483, 503 (N.D. Ill. 2015) (citation and internal quotations omitted); *In re Southwest Airlines Voucher Litig.*, No. 11-cv-8176, 2013 WL 4510197, at *7 (N.D. Ill. Aug. 26, 2013) ("In considering the strength of plaintiffs' case, legal uncertainties at the time of settlement favor approval.")

Ultimately, because a settlement is a compromise, "courts need not—and indeed should not—'reject a settlement solely because it does not provide a complete victory to the plaintiffs.'" *In re Capital One Telephone Consumer Protection Act Litig.*, 80 F. Supp. 3d 781, 790 (N.D. Ill. 2015) (quoting *In re AT&T*, 270 F.R.D. at 347). The parties to a settlement "benefit by immediately

- 13 -

resolving the litigation and receiving some measure of vindication for [their] position[s] while foregoing the opportunity to achieve an unmitigated victory." *In re AT&T*, 270 F.R.D. at 347.

Here, although Plaintiffs believe their TCPA claims against Uber are strong, they recognize that Uber's liability was far from certain. Plaintiffs undertook this litigation knowing that they would face staunch opposition from a defendant with substantial resources, strong legal defenses, and a willingness to litigate. Plaintiffs nonetheless successfully obtained a large, non-reversionary $20 million Settlement Fund and meaningful prospective relief in the face of several challenging defenses.

First, class certification in either the Illinois or California case would have been challenging due to the presence of individualized issues surrounding Uber's consent defense and the difficulty of identifying the individuals who received misdirected text messages. Second, the facts also presented several strong defenses on the merits for Uber, any of which, if successful, would have resulted in the Plaintiffs and the Settlement Class Members receiving no payment whatsoever.

For example, as to Settlement Class A, Uber argued in the California litigation that all "Refer-a-Friend" messages were the product of app users' "human intervention," and thus did not violate the TCPA because they were not sent using an ATDS. For the same reason, Uber asserted that it was not the "maker" or "initiator" of the Refer-a-Friend messages, and therefore all such messages should be deemed to be initiated by Uber app users, rather than Uber itself. *See Warciak v. Nikil, Inc.*, No. 16 C 5731, 2017 WL 1093162 (N.D. Ill. March 23, 2017); *McKenna v. WhisperText*, No. 5:14-cv-00424-PSG, 2015 WL 5264750, at *4–5 (N.D. Cal. Sept. 9, 2015). Uber was also poised to argue that the recipients of the Refer-A-Friend messages gave their express consent to their friends, who were required to certify to Uber in many cases that they had obtained that third-party consent, creating individualized issues of consent so as to preclude class

certification.[7]

As to Settlement Class B—the prospective drivers—Judge Tigar previously ruled that express written consent was not required because the text messages did not constitute telemarketing. *Lathrop*, No. 3:14-cv-05678-JST, Dkt. 49 at 8–9. Accordingly, Uber planned to argue that the Settlement Class B Members gave express consent to receive text messages when they input their phone numbers as part of their incomplete driver applications. Although the Settlement Class B Members subsequently attempted to revoke their alleged prior consent, Uber took the position that these attempts at revocation were ineffective, because they were not done through a "reasonable means" and did not follow Uber's opt-out protocol.

Finally, as to Settlement Class C, Uber argued that the relevant messages were not sent using an ATDS, because they were targeted to specific individuals—albeit not the person who ultimately received the message. (*See generally* Dkt. 52). Uber maintained that there is no liability under the TCPA for such "misdirected" or "wrong number" messages. (*Id.*)

The ATDS issue in particular posed substantial risk for all of the Settlement Class Members' claims due to the ongoing regulatory uncertainty surrounding the FCC's interpretation of ATDS. Over the past several years, the FCC has frequently considered and ruled on petitions that exclude certain text messaging equipment from the TCPA's definition of ATDS, including

---

[7] *See, e.g., Gannon v. Network Tele. Servs., Inc.,* 628 F. App'x 551 (9th Cir. 2016) (affirming denial of certification in TCPA case in part because determining consent would require individualized investigation); *Gene & Gene LLC v. BioPay LLC*, 541 F.3d 318, 329 (5th Cir. 2008) (holding that district court abused its discretion by certifying TCPA class because there were individualized issues regarding whether purported class members had consented to receiving faxes); *Sherman v. Yahoo! Inc.*, No. 13-cv-0041, 2015 WL 5604400, at *10 (S.D. Cal. Sept. 23, 2015) (denying certification in text-related action when defendant "set forth several plausible consent theories that apply differently to different class members" because "individualized inquiry would be required to determine the consent profile of each putative class member"); *Fields v. Mobile Messengers Am., Inc.*, No. C 12-05160, 2013 WL 6073426, at *4 (N.D. Cal. Nov. 18, 2013) (denying certification in text-related action because "individualized issues of consent preclude certification of a nationwide text-receipt class. Failure to show predominance of common issues under Rule 23 (b) is a showstopper.").

text messages sent in response to the actions of cellphone app users like those in this case. *See, e.g.*, *Wilkins v. HSBC Bank Nevada, N.A. et al.*, No. 14 C 190, 2015 WL 890566, at *6 (N.D. Ill. Feb. 27, 2015) (noting that "alternative interpretations" of the FCC Orders "will continue to add significant risk to large TCPA litigation") (citing *Capital One*, 80 F. Supp. 3d at 791). As several courts in this District have recognized, "the FCC frequently issues orders interpreting or reinterpreting the TCPA . . . the FCC's interpretations are binding on this Court . . . and prosecuting this litigation through discovery and a trial would only allow a greater opportunity for the FCC to issue" a ruling undermining Plaintiffs' and the Settlement Classes' claims. *See Kolinek*, 311 F.R.D. at 494. As such, the Settlement Class Members here ran the very real risk that FCC rulings could remove the types of text messages at issue from the TCPA's purview, further undermining their claims—particularly due to the forthcoming ruling from the D.C. Circuit Court of Appeals relating to, among other TCPA-related issues, the validity of prior FCC interpretations of ATDS. *See ACA Int'l v. FCC*, No. 15- 1211 (D.C. Cir.).

In light of the substantial risks of continued litigation, the value provided under this Settlement—both in terms of the monetary and nonmonetary relief—is exceptional, especially when compared to relief provided under similar TCPA settlements. *See, e.g., Capital One*, 80 F. Supp. 3d at 790 (providing a $34.60 recovery per claiming class member); *Arthur v. Sallie Mae, Inc.*, No. C10-0198JLR, 2012 WL 90101, at *3 (W.D. Wash. Jan. 10, 2012) (approving a settlement where class members could receive between $20 and $40); *Kazemi v. Payless Shoesource, Inc.*, No. 3:09-cv-05142, Dkt. 94 (N.D. Cal. Apr. 2, 2012) (providing a $25 voucher to each class member); *In re Jiffy Lube Int'l, Inc. Text Spam Litig.*, No. 3:11-MD-02261, Dkt. 97 (S.D. Cal. Feb. 20, 2013) (providing a $20 voucher, which could be redeemed for $15 cash after expiration of nine-month waiting period).

Given the complexity of the issues still to be litigated and the very real potential that Uber could succeed on the merits at summary judgment, at class certification, or at trial—depriving the Plaintiffs and Settlement Class Members of any relief whatsoever—the Settlement provides exceptional value. Accordingly, the first and most important *Synfuel* factor strongly supports final approval.

### 2. Continued litigation would increase the complexity, length, and expense of the litigation.

Under the second *Synfuel* factor, final approval is favored in cases like this where "[s]ettlement allows the class to avoid the inherent risk, complexity, time, and cost associated with continued litigation." *Schulte*, 805 F. Supp. 2d at 586; *In re Mexico Money Transfer Litig.,* 164 F. Supp. 2d 1002, 1019 (N.D. Ill. 2000) (finding that settlement is favored where "continued litigation would require resolution of complex issues at considerable expense and would absorb many days of trial time.").

Had this litigation not settled, Uber would have vigorously contested Plaintiffs' motion for class certification in the California litigation and proceeded to a second round of summary judgment briefing. And, in the Illinois litigation, Uber would have stood on its pending motion for judgment on the pleadings. Even if Uber's motion for judgment on the pleadings was denied, Uber would have similarly pursued summary judgment and opposed class certification in the Illinois litigation as well. In light of the complexity, uncertainty, and the amount of potential damages at issue, the losing party would likely appeal any adverse judgment, further delaying any resolution.

The Parties would therefore incur significant additional expenses if the Settlement is not approved, including the costs of further discovery, additional expert witness costs, filing and defending more pre-trial motions, including class certification briefing, and the enormous expenses involved in conducting a class action trial, requiring evidence and witnesses from across the

country to be convened. If anything, "this drawn-out, complex, and costly litigation process . . . would provide [Settlement] Class Members with either no in-court recovery or some recovery many years from now . . . ." *In re AT&T*, 789 F. Supp. 2d at 964. The Settlement, by contrast, avoids the uncertainty of trial and lengthy appeals, and instead provides valuable monetary and nonmonetary relief to the Settlement Class Members now. Therefore, the second *Synfuel* factor also weighs in favor of final approval.

> **3.  The lack of any real opposition to the Settlement demonstrates the Settlement Class Members' unqualified support for the settlement and supports final approval.**

The fact that there is almost no opposition to this Settlement is also "strong circumstantial evidence favoring settlement." *See In re Mexico Money Transfer Litig.*, 164 F. Supp. 2d at 1020–21 (finding that a settlement where "99.9% of class members have neither opted out nor filed objections . . . is strong circumstantial evidence in favor of the settlements"). Many Settlement Class Members have elected to participate in the settlement. Over 103,000 Settlement Class Members have submitted claim forms, and only 49 individuals elected to opt out, resulting in a claims-to-exclusions ratio of over 2,100-to-1. (Azari Decl. ¶¶ 39-40); *see In re AT&T*, 789 F. Supp. 2d at 965 (finding that an exclusion or objection rate of 0.01% of class members was "remarkably low" and supported approval of the settlement). Accordingly, the Settlement Class Members' strong participation demonstrates overwhelming support for this Settlement.

By the December 22, 2017 objection deadline, only two Settlement Class Members had filed objections. (Dkt. 98). One of the objectors, Ms. Krikava, has since withdrawn her objection after her attorney spoke with Class Counsel to clear up some misunderstandings Ms. Krikava had about the terms of the Settlement Agreement. (Dkt. 97, at 1). Her first objection was that the Settlement Class Members should not have to aver on the claim form that they had never given

Uber consent to text them. (Dkt. 95, at 1-4). Class Counsel provided her attorney with authority showing that such averments are common and acceptable in TCPA settlements[8] and with factual information establishing the basis for these averments in this case. (Dkt. 97, at 1.) Her second objection was that the Settlement Class Members who made claims should not all receive the same settlement allocation. (Dkt. 95, at 4-5.) Class Counsel provided her attorney with authority establishing that such allocations are proper in TCPA settlements in this District,[9] and provided factual information establishing the practical need for such an allocation here. (Dkt. 97, at 1.)

After receiving this information, Ms. Krikava withdrew her objection and voiced her support for final approval of this "excellent settlement." (*Id.*). Neither Ms. Krikava nor her counsel received any compensation in exchange for withdrawing her objection. (*Id.*).

The only other objector, Kerry Ann Sweeney, is a professional objector whose objection is factually and legally baseless. Although Ms. Sweeney appears *pro se* here, her father, Patrick

---

[8] For example, in *Kolinek v. Walgreen, Co.*, Judge Kennelly rejected an objection to the claims process on the basis that a claim form containing a checkbox for TCPA class members "*to affirm* that they wish to make a claim *because they received* prerecorded prescription refill reminder *calls without their prior express consent.*" 311 F.R.D. at 499 (emphasis added). The court found that it was "neither unfair nor unreasonable to ask claimants to submit these claim forms." *Id.* Similarly, in *Wright v. Nationstar Mortgage LLC*, Judge Chang granted final approval of a TCPA settlement in which the claim form was required to be, among other things, "signed by the Settlement Class Member, physically or electronically, *affirming that the Settlement Class Member received one or more Telephone Calls on his or her cell phone without his or her prior express consent.*" No. 14 C 10457, 2016 WL 4505169, at *1 n.2 (N.D. Ill. Aug. 29, 2016), *appeal dismissed* (Oct. 24, 2016), *appeal dismissed sub nom. Wright v. Nationstar Mortg., LLC*, No. 16-3538, 2016 WL 9752125 (7th Cir. Oct. 21, 2016), and *appeal dismissed sub nom. Wright v. Nationstar Mortg., LLC*, No. 16-3537, 2016 WL 9752126 (7th Cir. Oct. 25, 2016).

[9] *See, e.g.*, *Wright v. Nationstar Mortgage LLC*, 2016 WL 4505169, at *8, *appeal dismissed sub nom. Wright v. Nationstar Mortg., LLC*, 2016 WL 9752126 (rejecting objection to not compensating class members on a per call basis for settlement that pays $45.00 per claimant); *Gehrich v. Chase Bank USA, N.A.*, 316 F.R.D. 215, 228, 231 (N.D. Ill. 2016) (rejecting objection to per-member payment of $52.50 per claimant, where class members received different numbers of calls); *Kolinek*, 311 F.R.D. at 493–94 (granting final approval settlement that awarded approximately $30 per claimant, regardless of number of prescription refill calls received); *Wilkins*, 2015 WL 890566, at *5–6, 8 (approving $93.22 per claimant settlement over five objections seeking compensation based on number of calls received); *In re Capital One*, 80 F. Supp. 3d at 789, 793 (rejecting objection that claimants "should be able to make claims against the settlement fund for every call they received," where payment of $34.60 per claimant would be issued).

Sweeney, has previously represented her (and her mother) in class action objections, and has been criticized by numerous courts as a "professional" or "serial" objector known for filing frivolous objections. *See, e.g., In re Yahoo Mail*, 2016 WL 4474612, at *8 (N.D. Cal. Aug. 25, 2016) ("[D]iscovery reveals that Sweeney is a serial objector. During Sweeney's deposition, Sweeney revealed that he had objected in 25 federal cases across the country. Many courts have found Sweeney's objections to be meritless"); *Spann v. J.C. Penney Corp.*, 211 F. Supp. 3d 1244, 1260 n.11 (C.D. Cal. 2016) ("Mr. Sweeney is a known 'serial' objector"); *Chambers v. Whirlpool Corp.*, 214 F. Supp. 3d 877, 890 (C.D. Cal. 2016) (same); *In re Carrier IQ, Inc., Consumer Privacy Litig.*, No. 12-md-02330-EMC, 2016 WL 4474366, at *5 (N.D. Cal. Aug. 25, 2016) (same); *In re Polyurethane Foam Antitrust Litig.*, 178 F. Supp. 3d 635, 639 (N.D. Ohio 2016) (same); *Brown v. Hain Celestial Grp., Inc.*, No. 3:11-cv-03082-LB, 2016 WL 631880, at *10 (N.D. Cal. Feb. 17, 2016) (same); *Roberts v. Electrolux Home Prods., Inc.*, No. SACV-12-1644-CAS(VBKx), 2014 WL 4568632, at *11–15 (C.D. Cal. Sept. 11, 2014) (same).

Attached as <u>Exhibit C</u> is a complete list of objections filed by Ms. Sweeney and her family. As shown, Ms. Sweeney appears to have filed objections in eight class action cases, and her family members have collectively filed at least 45 additional objections, for a total of at least 53 objections filed by the Sweeney family. Importantly, however, it does not appear that *any* court has sustained *any* of those objections.

In addition to being a serial objector, Patrick Sweeney has also been criticized by numerous courts for bringing patently meritless objections. For example, in imposing a $145,463 appeal bond on Mr. Sweeney and fellow objectors in *In re Polyurethane Foam*, the court found that the objections brought by Mr. Sweeney and a fellow objector:

> amount to pure boilerplate language, wholly untethered from the actual terms of the settlement. They neither sought to argue nor appeared at the fairness hearing. Their

> behavior needlessly increased the burdens on Class Counsel and this Court.
> Conduct of this sort falls squarely within the definition of vexatious conduct.

178 F. Supp. 3d at 640; *see also Roberts*, 2014 WL 4568632, at *12 ("Aside from the fact that the Court finds that [Mr. Sweeney's] objection is lawyer-driven and appears to be brought for an improper motive, and would otherwise delay important safety benefits to the Settlement Class members, the Court also finds that the objection is without merit, without evidentiary support and rests on inaccurate premises and mischaracterizations of the Settlement."). Mr. Sweeney's abusive filings have also prompted litigants to seek sanctions. *See, e.g., In re Carrier IQ, Inc., Consumer Privacy Litig.*, 2016 WL 4474366, at *5 & n.4 (seeking sanctions and "alleging that his objection is frivolous and harassing because he is not a class member and does not have standing to object").

Another judge chastised Mr. Sweeney for submitting objections in *two separate cases* up for final approval *on the same day*, both of which "set forth facts unrelated to either case." *Chambers*, 214 F. Supp. 3d at 890 n.7; *Spann*, 211 F. Supp. 3d at 1260 n.11. Indeed, at least three separate courts have found that Mr. Sweeney filed objections even though he failed to demonstrate standing as a class member to bring an objection. *In re Carrier IQ*, 2016 WL 4474366, at *5 (finding that Sweeney lacked standing); *In re Yahoo Mail*, 2016 WL 4474612, at *8; *In re TRS Recovery Servs., Inc. and Telecheck Servs., Inc. FDCPA Litig.*, No. 2:13-MD-2426-DBH, 2016 WL 543137, at *6 n.16 (D. Maine Feb. 10, 2016) (finding that Sweeney "furnished no basis to conclude that he is even a class member"); *see also Chambers*, 214 F. Supp. 3d at 890 (striking Sweeney's objection after he "refused to comply with class counsel's discovery requests").

Ms. Sweeney's objections have likewise been repeatedly rejected, and her appeals have been repeatedly dismissed for failure to pay required filing fees. *See e.g., Patrick Cotter v. Lyft, Inc.*, No. 17-15724, Dkt. 10 at 1 (9th Cir. June 5, 2017).[10] Plaintiffs have not found even a single

---

[10] *See* http://www.serialobjector.com/persons/155 (last visited January 11, 2018) for partial list.

instance where Ms. Sweeney brought a successful objection. To the contrary, Plaintiffs have

identified at least **eight** instances of meritless or abandoned objections:

1. *Larsen v. Trader Joe's Co.*, No. 11-cv-05188-WHO, 2014 WL 3404531, at *7 (N.D. Cal. July 11, 2014) (overruling objection brought on behalf of Ms. Sweeney and by Ms. Sweeney's parents);

2. *Patrick Cotter v. Lyft, Inc.*, No. 13-cv-4065, Dkt. 264 (N.D. Cal. Nov. 1, 2016) (overruling Ms. Sweeney's objection) *appeal dismissed*, App. No. 17-15724, Dkt. 10 (dismissing appeal "for failure to pay fees.");

3. *In re Magsafe Apple Power Adapter Litig.*, No. 09-cv-1911, Dkt. 86 (N.D. Cal. Jan. 6, 2012) *appeal dismissed*, App. No. 12-16053, Dkt. 19 (voluntarily dismissing her appeal after failing to pay the ordered $15,000 appeal bond);

4. *Hendricks v. Starkist Co.*, No. 13-cv-00729, Dkt. 299, 373 (N.D. Cal. Nov. 20, 2015) (overruling Ms. Sweeney's objections);

5. *Melito v. Am. Eagle Outfitters, Inc.*, No. 14-cv-2440, Dkt. 275 (S.D.N.Y June 5, 2017) (filing objection through her father, Patrick Sweeney, but later withdrawing her objection);

6. *Legg v. Spirit Airlines, Inc.*, No. 14-cv-61978, Dkt. 141 (S.D. Fla. June 20, 2016) (same);

7. *In re Checking Account Overdraft Litig.*, No. 09-md-2036, Dkt. 3698 (S.D. Fla. Nov. 13, 2013) (same);

8. *Cody v. SoulCycle, Inc.*, No. 15-cv-6457, Dkt. 254 (C.D. Cal. Oct. 3, 2017) (overruling Ms. Sweeney's objection to attorney's fees).

Through their at least 53 objections, Ms. Sweeney and her family are engaged in what

courts and commentators have characterized as "objector blackmail." Fitzpatrick, Brian T., *The*

*End of Objector Blackmail?*, 62 VAND. L. REV. 1623, 1624–25, 1633–41 (2009); *see* Exh. C.

Courts across the country have condemned this conduct as a shakedown designed to force class

counsel to buy off professional objectors so that the class settlement may proceed.

> [P]rofessional objectors can levy what is effectively a tax on class action settlements, a tax that has no benefit to anyone other than to the objectors. Literally nothing is gained from the cost: Settlements are not restructured and the class, on whose benefit the appeal is purportedly raised, gains nothing.

*In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1361 n.30 (S.D. Fla. 2011) (quotations omitted, alteration in original).[11] As another court observed in a case in which Mr. Sweeney was found to be a "professional, or serial objector," "[t]he serial objector's ultimate goal is extortion." *In re Polyurethane Foam Antitrust Litig.*, 178 F. Supp. 3d at 639 (quoting *In re Initial Pub. Offering Sec. Litig.*, 728 F. Supp. 2d 289, 295 (S.D.N.Y. 2010) ("[P]rofessional objectors undermine the administration of justice by disrupting settlement in the hopes of extorting a greater share of the settlement for themselves and their clients.")).

In light of her history as a serial objector, it is not surprising that Ms. Sweeney's objection to Plaintiffs' request for attorney's fees is founded on factual inaccuracies and misunderstandings of law. *First*, Ms. Sweeney's objection turns on her mistaken belief that Plaintiffs have requested a fee of 33% of the total Settlement Fund, or $6,660,000. (Dkt. 98-2, at 3). Plaintiffs have *not* sought that amount; rather, Plaintiffs have requested a fee award of $6,350,000—which is less than one-third of the total Settlement Fund—based on the sliding scale formula that courts in this District have adopted for TCPA class actions like this one. (Dkt. 93, at 2, 16-24) (citing *Aranda v. Caribbean Cruise Line, Inc.*, No. 12 C 4069, 2017 WL 1369741 (N.D. Ill. Apr. 10, 2017)).

*Second*, Ms. Sweeney's objection faults Plaintiffs' fee request for not using the "sliding scale" method adopted in *Aranda*, even though Plaintiffs' fee request was, in actuality, determined using the *Aranda* court's sliding scale formula. (Dkt. 93, at 15–17) (citing *Aranda* and applying the sliding scale approach). Ms. Sweeney's assertion is simply wrong. As detailed in Plaintiffs' Motion for Attorneys' Fees, Plaintiffs applied the sliding-scale formula and requested an upward risk adjustment of 6% to the two tranches of the Settlement Fund, yielding a risk-adjusted fee

---

[11] Ms. Sweeney was also an objector in one of the settlements in the overdraft MDL. *See In Re: Checking Account Overdraft Litig.*, No. 09-md-2036, Dkt. 3698.

award of $6,350,000 (36% of the first $10 million tranche of the Settlement Fund, plus just under 31% of the second tranche of $9,043,000, after subtraction of the costs of notice, claims administration and incentive awards). (*Id.*). This is the same method of calculating fees that the *Aranda* court used. *See Aranda*, 2017 WL 1369741, at *9 (applying the sliding scale formula with a risk premium of 6% to the first tranche, 5% to the second, 4% to the third, and so on).[12]

Ms. Sweeney makes no objection at all to the risk adjustments sought by Plaintiffs—which are plainly supported by the record in this set of complex cases that have been winding through courts across the country for years. Accordingly, the fee award requested here is completely consistent with the methodology set forth in *Aranda*.

The fundamental inaccuracies in Ms. Sweeney's objection reveal how uninformed and baseless her objection is and suggest that her motive is not to improve the settlement for the Settlement Class Members, but instead is to hold the settlement process hostage and extort self-interested payments for herself. Indeed, Ms. Sweeney has indicated that she does not even intend to appear at the Final Approval Hearing in this case. (Dkt. 98-2, at 2). The Federal Judicial Center advises courts to "[w]atch out . . . for canned objections from professional objectors who seek out class actions to extract a fee by lodging generic, unhelpful protests."[13] Ms. Sweeney and her parents are exactly the type of professional objectors that the Federal Judicial Center warns about. In short, Ms. Sweeney's boilerplate objection is not only totally disconnected from Plaintiffs' actual fee request, it is also meritless and provides no benefit to the Court or to the Settlement Class Members—it simply asks the Court to apply the *Aranda* sliding scale analysis that Plaintiffs

---

[12] Ms. Sweeney could have easily determined this by examining Plaintiffs' motion for attorney's fees, which was posted on the Settlement Website—https://www.ubertcpasettlement.com/.
[13] Barbara J. Rothstein & Thomas E. Willging, *Managing Class Action Litigation: A Pocket Guide for Judges* 17 (Fed. Jud. Ctr., 3rd ed. 2010), *available at* http://www.fjc.gov/public/pdf.nsf/lookup/classgd3.pdf/$file/classgd3.pdf.

already asked the Court to apply. The objection should therefore be overruled.

### 4.    The opinion of competent counsel favors approval.

The next factor courts consider is the opinion of competent counsel regarding the fairness, reasonableness, and adequacy of the settlement. *Synfuel*, 463 F.3d at 653; *see also Schulte*, 805 F. Supp. 2d at 586 ("The opinion of competent counsel is relevant to the question whether a settlement is fair, reasonable, and adequate under Rule 23."). Courts are entitled to rely on the opinion of competent counsel, especially where counsel are qualified, discovery has taken place, and the settlement is the product of arms-length negotiations, such that there is no indication of collusion. *See Isby*, 75 F.3d at 1200; *Hispanics United v. Vill. of Addison*, 988 F. Supp. 1130, 1150 n. 6 (N.D. Ill. 1997) (noting a "strong initial presumption of fairness attaches" where settlement is "the result of arm's length negotiations," and where counsel are "experienced and have engaged in adequate discovery.").

Here, Class Counsel have expressed their support for the Settlement and believe, based on their extensive class action experience, that the Settlement is an excellent result for the Settlement Class Members. Class Counsel are experienced members of the plaintiff's class action bar who have built their practice litigating similarly complex consumer class actions and are capable of assessing the strengths and weaknesses of the Parties' respective positions. (*See generally* Declaration of Myles McGuire in Support of Plaintiffs' Unopposed Motion For Approval Of Attorneys' Fees, Expenses, And Incentive Awards, Dkt. 93-3, ¶¶ 6–7; Declaration of Hassan A. Zavareei in Support of Plaintiffs' Unopposed Motion for Approval of Attorney Fees, Expenses, and Incentive Awards, Dkt. 93-2, ¶¶ 2, 6). Class Counsel have regularly handled complex litigation on behalf of consumers and have extensive experience in class action lawsuits similar in size and complexity to the instant case. (*Id.*). Class Counsel and their firms have been appointed as class

counsel in numerous complex consumer class actions, including many similar class actions involving violations of the TCPA, in state and federal courts across the country. (*Id.*).

The attorneys of McGuire Law, P.C. in particular have extensive knowledge of the law governing telecommunications and cellular telephony. (Dkt. 93-3, ¶¶ 6–7). Recognized as pioneers in the field of consumer class actions involving claims brought under the TCPA, McGuire Law attorneys have served as counsel of record for numerous groundbreaking TCPA rulings involving cellular telephony at the federal district and appellate court levels, including recently at the U.S. Supreme Court. (*Id.*) (citing *Campbell-Ewald Co. v. Jose Gomez*, 136 S. Ct. 663 (2016)).

This extensive, relevant experience has allowed Class Counsel to accurately weigh the merits of the Settlement Class Members' claims along with the risks and potential rewards of continued litigation through trial and appeals compared against the benefits provided under the Settlement. Class Counsel believe that the Settlement provides substantial relief for individuals who may otherwise be left without a remedy due to the time, expenses, and risks inherent in further litigation. This, in addition to the fact that the Settlement was reached following discovery and arms-length, often contentious, negotiations, strongly favors final approval.

### 5. The stage of the proceedings and the amount of discovery completed also weigh in favor of final approval.

The final *Synfuel* factor—the stage of the proceedings and amount of discovery completed at the time of the settlement—also supports final approval here. 463 F.3d at 653. This factor generally favors approval of a settlement where "discovery and investigation conducted by class counsel prior to entering into settlement negotiations was extensive and thorough." *Isby*, 75 F.3d at 1200 (citation and internal quotations omitted). However, courts also regularly approve settlements achieved even prior to the commencement of formal discovery, especially where counsel "have conducted a significant amount of informal discovery and dedicated a significant

amount of time and resources to advancing the underlying lawsuits." *In re AT&T*, 270 F.R.D. at 350.

As explained in Plaintiffs' prior submissions, the Parties reached this Settlement at an advanced stage in this litigation. In the California case, Class Counsel defeated a motion to dismiss, defeated a motion to stay, staved off an early motion for summary judgment, engaged in extensive discovery efforts, and served two lengthy and thorough expert reports on key issues. (Dkt. 93, at 5–7). In the Illinois litigation, Class Counsel similarly fought many battles, including litigating two motions to stay and two motions for judgment on the pleadings, propounding two sets of written discovery on Uber, and responding to Uber's written discovery requests. (*Id.* at 7–8). At the time when the Parties agreed to mediate, Plaintiffs in the California litigation were preparing to file their motion for class certification. And even after the mediation was scheduled, briefing continued before the mediator. (*Id.* at 8–9).

Because negotiations began at a late stage, the Settlement followed extensive discovery and investigation. In connection with discovery in the California case, Class Counsel prepared and served initial disclosures, several sets of interrogatories, requests for admission, and ten sets of document requests; responded to discovery requests, including interrogatories and document requests to each named plaintiff; reviewed over 4,000 pages of documents; met and conferred with defense counsel to resolve various discovery disputes; served third-party discovery; took three Rule 30(b)(6) depositions of Uber, four depositions of Uber employee witnesses, and a third-party deposition; and prepared for and defended the California Plaintiffs' depositions. (*Id.* at 5–7). Class Counsel prevailed on several discovery disputes via the *Lathrop* court's letter briefing process, which involved filing and arguing five letter briefs. (*Id.* at 6).

There can be no doubt that Plaintiffs' dogged pursuit of critical discovery strengthened

their cases. The discovery process informed Plaintiffs' arguments as to class certification and Plaintiffs' strategy during settlement negotiations, which were essential to achieving this Settlement. Accordingly, the final *Synfuel* factor, like the four others, weighs in favor of final approval and supports a finding that the Settlement is fair, reasonable, and adequate.

### C. The Court Should Also Approve Plaintiffs' Request For Attorney's Fees, Costs, And Incentive Awards.

Because all five *Synfuel* factors favor granting final approval of the Settlement, the Court should also approve Plaintiffs' requested award of attorney's fees, costs, and expenses, and the incentive awards. Plaintiffs filed their Motion for Attorneys' Fees on November 15, 2017, a month before the claims deadline of December 15, and more than five weeks before the objection deadline of December 22. Further, each form of the class notice informed Settlement Class Members of the maximum amount of attorney's fees, costs, expenses, and incentive awards that could be sought. In addition, the Settlement Administrator posted the Motion for Attorneys' Fees on the Settlement Website. This gave Settlement Class Members ample opportunity to consider the merits of the Motion for Attorneys' Fees and raise any concerns with the amounts requested.

Apart from the frivolous Sweeney objection discussed above, no objections to the attorney's fees or incentive awards were filed, and Class Counsel has not received any correspondence or complaints from Settlement Class Members expressing dissatisfaction with the fees, costs, expenses, or incentive awards sought. The lack of any real opposition is unsurprising because, as discussed above, Class Counsel have worked assiduously to obtain a tremendous cash benefit for the Settlement Class Members, and this litigation has already changed Uber's text messaging practices in ways that benefit the Settlement Class Members and the public.

As explained in detail in Plaintiffs' Motion for Attorneys' Fees, Class Counsel's requested fee award is justified given the exceptional monetary and nonmonetary relief provided under the

Settlement, is consistent with Seventh Circuit law and fee awards granted in similar TCPA class action settlements in this District, and is also reasonable given Class Counsel's lodestar, which reflects the significant time and effort Class Counsel have committed to resolving this litigation for the benefit of the Settlement Class Members. Plaintiffs respectfully request that this Court approve the fees, costs, expenses, and incentive awards requested in the Motion for Attorneys' Fees.

## V.  __CONCLUSION__

For the foregoing reasons, and for the reasons stated in Plaintiffs' Motion for Approval of Attorneys' Fees, Expenses, and Incentive Awards (Dkt. 93), Plaintiffs respectfully request that the Court enter an order: (1) finding that the Settlement is fair, reasonable, and adequate; (2) granting final approval of the Settlement; (3) approving Plaintiffs' request for attorneys' fees, costs, expenses, and incentive awards; and (4) granting such further and additional relief as the Court deems appropriate.

Dated: January 12, 2018

Respectfully submitted,

MARIA VERGARA, JAMES LATHROP,
SANDEEP PAL, JENNIFER REILLY,
JUSTIN BARTOLET, and JONATHAN
GRINDELL, individually and on behalf of
classes of similarly situated individuals

By: /s/ *Paul T. Geske*
One of Plaintiffs' Attorneys

Myles McGuire
Evan M. Meyers
Paul T. Geske
MCGUIRE LAW, P.C.
55 W. Wacker Drive, 9th Floor
Chicago, IL 60601
Tel: (312) 893-7002
Fax: (312) 275-7895
mmcguire@mcgpc.com

emeyers@mcgpc.com
pgeske@mcgpc.com

Hassan A. Zavareei (*pro hac vice*)
Andrea R. Gold (*pro hac vice*)
Andrew J. Silver (*pro hac vice*)
TYCKO & ZAVAREEI LLP
1828 L Street, N.W., Suite 1000
Washington, DC 20036
Tel.: (202) 973-0900
Fax: (202) 973-0950
hzavareei@tzlegal.com
agold@tzlegal.com
asilver@tzlegal.com

## CERTIFICATE OF SERVICE

I hereby certify that on January 12, 2018, I electronically filed the foregoing *Plaintiffs'*
*Motion for Final Approval of Class Action Settlement* with the Clerk of the Court using the
CM/ECF system. A copy of said document will be electronically transmitted to all counsel of
record.

/s/ *Paul T. Geske*